IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

------------

No. 92-7493

------------

IN RE:   AMERICAN AIRLINES, INC.,
         AMR CORPORATION,
                                    Petitioners.

------------

Petition for Writ of Mandamus
to the United States District Court
for the Southern District of Texas

------------

( September 4, 1992 )

Before POLITZ, Chief Judge, HIGGINBOTHAM, and BARKSDALE, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

American Airlines, Inc. petitions for a writ of mandamus directing the district court to disqualify its former counsel Vinson & Elkins from representing plaintiff Northwest Airlines, Inc. We hold that the district court erred in denying American's motion and issue the requested writ.

I

Continental Airlines filed a complaint against American in the United States District Court for the Southern District of Texas on June 8, 1992, charging American with attempted monopolization by predatory pricing in violation of the Sherman Act. American filed

a declaratory judgment action against Continental and Northwest in the United States District Court for the Northern District of Illinois the following day. Three days later, Northwest sued American in the Southern District of Texas. The Continental and Northwest suits have been consolidated by order of the district court.

On June 9, 1992, the day after Continental filed its complaint, David Schwarte, American's in-house counsel, asked Alison Smith, a VE partner, if VE would represent American in this case. Smith accepted the American representation on June 10, unaware that four days earlier Harry Reasoner, another VE partner, had promised Joe Jamail, Northwest's counsel, that VE would not consider representing another airline until Jamail and Reasoner had discussed joining forces. When Smith informed Reasoner of her acceptance of the American representation, Reasoner directed her to inform Schwarte that "there might be a problem with Northwest" and that Reasoner would make the final decision the next day. On June 11 Reasoner accepted the Northwest representation.

American asserted that VE's prior representation of American and its agreement to do so in this case made its representation of Northwest improper. It requested that VE withdraw from the case in letters sent on June 12 and June 19. Northwest refused and on July 1 American moved to disqualify VE. The parties at this time became aware that Weil, Gotshal & Manges, American's lead counsel, had previously represented Northwest and Continental. An exchange of "conflicts" was briefly considered. When American indicated

2

that it would not withdraw its motion to disqualify VE, Northwest moved to disqualify Weil, Gotshal on July 13.

American rests its motion to disqualify Vinson & Elkins on VE's representation of American in prior antitrust matters and its alleged agreement to represent it in this case. According to American, Vinson & Elkins has served as its "Houston" antitrust counsel since 1987. In this role VE defended American in suits by Continental and a Continental affiliate. VE also provided antitrust advice in connection with American's possible acquisition of Continental.

On July 24, after extensive briefing and the submission of numerous affidavits, the district court denied both motions to disqualify counsel. The court held that VE's initial acceptance of the American representation was a "mixup," that the past matters in which VE had represented American were only "tangentially related to this litigation," and that any confidential information possessed by VE was "not sufficient to cause any material prejudice to [American]." The court directed the parties to submit a plan for a Chinese Wall to safeguard against adverse use of confidential information in the case. American then filed the petition for writ of mandamus now before us.

II

We must first determine our jurisdiction. Orders denying motions to disqualify counsel are not appealable before final judgment under 28 U.S.C. § 1291. Firestone Tire & Rubber Co. v. Risjord, 449 U.S. 368, 375 (1981); see also Richardson-Merrell,

3

Inc. v. Koller, 472 U.S. 424 (1985) (extending rule to orders granting motions to disqualify). While holding that disqualification orders are not immediately appealable as a matter of course, the Firestone Court indicated that a writ of mandamus might be available "in the exceptional circumstances for which it was designed." Firestone, 449 U.S. at 378 n.13; Koller, 472 U.S. at 435. American contends that this case presents the requisite "exceptional circumstances."

The standards are well established: "[P]etitioners must show that they lack adequate alternative means to obtain the relief they seek . . . and carry the 'burden of showing that [their] right to issuance of the writ is "clear and indisputable."'" Mallard v. United States Dist. Ct. for the S. Dist. of Iowa, 109 S.Ct. 1814, 1822 (1989) (citations omitted); In re Fibreboard Corp., 893 F.2d 706, 707 (5th Cir. 1990); In re Willy, 831 F.2d 545, 549 (5th Cir. 1987). The test contains two prongs, one procedural and one substantive, and unless American demonstrates that it lacks an adequate alternative means to obtain relief, we need not consider whether its right to a writ of mandamus is "clear and indisputable."

Courts confronting this question have suggested that "[d]enial of a motion to disqualify counsel will rarely justify the issuance of a writ of mandamus." In Re Ford Motor Co., 751 F.2d 274, 275 (8th Cir. 1984); see also In re Mechem, 880 F.2d 872, 873 (6th Cir. 1989); In re Bushkin Assocs., Inc., 864 F.2d 241, 243-44 (1st Cir. 1989). We agree that frequent use of the writ would "'undermine[]

4

the policy against piecemeal appellate review,'" Mechem, 880 F.2d at 875 (quoting Allied Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 36 (1980) (per curiam)), and thus we have stressed that "mandamus may not serve as a substitute for appeal." Warren v. Bergeron, 831 F.2d 101, 103 (5th Cir. 1987). We also have recognized, however, that the standard governing the availability of mandamus is not "never," but "hardly ever." Allied Chemical, 101 S.Ct. at 190. Thus, this court has recently held that a writ of mandamus will be available in certain cases to obtain immediate review of a district court's denial of a disqualification motion. In re Dresser Industries, No. 92-2199 (5th Cir. Aug. 21, 1992). See also In re American Cable Publications, Inc., 768 F.2d 1194 (10th Cir. 1985) (issuing writ on petition to review a grant of disqualification motion); Merle Norman Cosmetics, Inc. v. United States Dist. Ct., Central Dist. of Cal., 856 F.2d 98, 101 (9th Cir. 1988) (recognizing that "if petitioners' claims were wellfounded [sic], the damage would be irremediable," but denying writ on other grounds). As in Dresser, we find the special circumstances of the present dispute sufficient to place it within that narrow class of cases warranting mandamus review.

American claims that immediate review of its disqualification motion is appropriate because it will otherwise suffer "irreparable harm" and also because "attorneys and clients throughout Texas need the benefit of this Court's guidance on this issue of grave importance." We agree. First, the nature and size of this litigation would seem to preclude effective appellate review upon

5

final judgment. In addition, this case raises several questions pertaining to the proper interpretation and application of ethical standards in disqualification cases. As illustrated by our recent Dresser opinion, it is relevant to mandamus review that the "district court's order was not a mere discretionary one but rather turns on legal questions appropriate for appellate review." In re Burlington N., Inc., 822 F.2d 518, 523 (5th Cir. 1987). It is also relevant that, as in Dresser and Burlington, "[t]he issues here also have importance beyond the immediate lawsuit." Id. at 523; In re EEOC, 709 F.2d 392, 394-95 (5th Cir. 1983). For these reasons, we hold that American has demonstrated the absence of an adequate alternative to mandamus review.

Having met the "procedural" requirement for a writ of mandamus, American must also demonstrate that its right to the issuance of the writ is "clear and indisputable." This test goes to the merits, and we pause only to set out the standard of review. The Supreme Court has indicated that "[w]here a matter is committed to discretion, it cannot be said that a litigant's right to a particular result is 'clear and indisputable.'" Allied Chemical, 101 S.Ct. at 191. In accord with these dictates, this court has held that a writ of mandamus should not issue merely because we believe that "we might have exercised the discretion vested in that court differently than the district court exercised it." Matter of Hester, 899 F.2d 361, 367 (5th Cir. 1990).

In this circuit, however, a district court's ruling upon a disqualification motion is not a matter of discretion. Rather, the

6

appellate court "review[s] findings of fact for clear error 'while carefully examining the district court's application of relevant ethical standards.'" Johnston v. Harris County Flood Control Dist., 869 F.2d 1565, 1569 (5th Cir. 1989) (quoting Cossette v. Country Style Donuts, Inc., 647 F.2d 526, 531 (5th Cir. 1981)). Conceding that abuse of discretion review is not appropriate, Northwest asserts that this case centers on disputed factual matters, and that the district court's findings deserve deference. Assuming arguendo that the district court made findings on these contested questions of fact, it is clear that the court was guided by a particular reading of the Texas Disciplinary Rules in making these relevant factual determinations. Whatever deference due the court's factual findings, little or no deference is proper in reviewing its interpretation of ethical rules. We have recently held that a "district court's interpretation of the state disciplinary rules [is] an interpretation of law, subject essentially to de novo consideration." Dresser, No. 92-2199, slip op. at 6975-76. In accord with Dresser, our review of the district court's reading of the relevant ethical standards will be de novo.

### III

We turn to the applicable law. The Local Rules of the Southern District of Texas provide that "[t]he Code of Professional Responsibility adopted by this court is the Code of Professional Responsibility of the State Bar of Texas, as amended from time to time." Tex. Rules of Court, Federal App. A, Rule 4B. Texas replaced the Texas Disciplinary Code with the Texas Disciplinary

7

Rules of Professional Conduct in 1990. Recognizing the new Rules as an amendment of the old Code, this Court has applied the Rules. See In re Medrano, 956 F.2d 101, 102 n.3 (5th Cir. 1992). The parties do not contest application of the Rules.

We have recently held, however, that the Texas Rules, as adopted by the Southern District of Texas, are not the "'sole' authority governing a motion to disqualify." Dresser, No. 92-2199, slip op. at 6976. In reviewing a motion to disqualify, "we consider the motion governed by the ethical rules announced by the national profession in light of the public interest and the litigants' rights." Id. As Dresser indicates, our precedents have applied the ethical canons contained in the ABA Model Code. See, e.g., Brennan's Inc. v. Brennan's Restaurants, Inc., 590 F.2d 168 (5th Cir. 1979); Woods v. Covington County Bank, 537 F.2d 804 (5th Cir. 1976).

The parties' extensive citation of this court's precedents applying the ABA Model Code suggests their recognition that the Texas Rules, as adopted by the Southern District of Texas, are not the "sole" authority governing this case. Moreover, we do not believe that our holding in Dresser has rendered the parties' arguments grounded in the Texas Rules irrelevant to our decision. The Texas Rules were patterned after the ABA Model Rules of Professional Conduct, which the Dresser court cited along with the Model Code as the national standards utilized by this circuit in ruling on disqualification motions. Since the relevant ABA Rules do not differ materially from the corresponding Texas Rules, the

8

parties' interpretations of the Texas Rules are equally applicable in this case. Our discussion will therefore center on the Texas Rules.

As we confirmed in <u>Dresser</u>, "[m]otions to disqualify are substantive motions affecting the rights of the parties and are determined by applying standards developed under <u>federal law</u>." <u>Dresser</u>, No. 92-2199, slip op. at 6976; <u>see also</u> <u>In re Snyder</u>, 105 S.Ct. 2874, 2881 n.6 (1985); <u>In re Finkelstein</u>, 901 F.2d 1560, 1564 (11th Cir. 1991); <u>United States v. Miller</u>, 624 F.2d 1198, 1200 (3d Cir. 1980); <u>Cord v. Smith</u>, 338 F.2d 516, 524 (9th Cir. 1964). Federal courts may adopt state or ABA rules as their ethical standards, but whether and how these rules are to be applied are questions of federal law. We stress this because Northwest contends that the Texas Rules control the discretion of a district court. According to Northwest, "a trial court is not forced by literalism or mechanical standards to do injustice serving the mere litigation tactics of a party. Rather, a trial court, <u>according to the Rules</u>, is to determine if there is actual prejudice or threatened interference with the fair administration of justice." See Texas Rule 1.06 Comment 17; ABA Rule 1.7 Comment.

As we have indicated, disqualification cases are governed by state and national ethical standards adopted by the court. We disagree with Northwest's suggestion that these sources also determine the discretion of a district court applying these rules. That issue is one governed by federal law.

Some courts have taken the position Northwest advances, namely that "[t]he business of the court is to dispose of litigation and not to act as a general overseer of the ethics of those who practice here unless the questioned behavior taints the trial of the cause before it."  W.T. Grant Co. v. Haines, 531 F.2d 671, 677 (2d Cir. 1976); Board of Educ. v. Nyquist, 590 F.2d 1241, 1246 (2d Cir. 1979); Armstrong v. McAlpin, 625 F.2d 433, 445-46 (2d Cir 1980).  See also Sutton, How Vulnerable is the Code of Professional Responsibility?, 57 N.C.L.Rev 497, 514-16 (1979).  An attorney's ethical violation by itself does not warrant disqualification under this approach.  Rather, disqualification is proper only in cases where a court also finds that the unethical conduct threatens to taint the trial.  This more limited test largely rests on a belief that disqualification motions are often made for tactical reasons such as delay or harassment.  While the "taint" standard "fails to correct all possible ethical conflicts," Armstrong, 625 F.2d at 445, it is argued that this limited disqualification rule serves to deter many meritless, tactical motions that would otherwise be filed.

This circuit, however, has struck a different balance, electing to remain "sensitive to preventing conflicts of interest." Matter of Consolidated Bankshares, Inc., 785 F.2d 1249, 1256 (5th Cir. 1986).  We have squarely rejected this hands-off approach in which ethical rules "guide" whether counsel's presence will "taint" a proceeding, holding instead that a "[d]istrict [c]ourt is obliged to take measures against unethical conduct occurring in connection

10

with any proceeding before it." <u>Woods v. Covington County Bank</u>, 537 F.2d 804, 810 (5th Cir. 1976) (emphasis added); <u>Musicus v. Westinghouse Elec. Corp.</u>, 621 F.2d 742, 744 (5th Cir. 1980); <u>E.F. Hutton & Co. v. Brown</u>, 305 F. Supp. 371, 376-77 (S.D. Tex. 1969); <u>see also</u> <u>Kevlik v. Goldstein</u>, 724 F.2d 844, 847 (1st Cir. 1984) ("the district court has the duty and responsibility of supervising the conduct of attorneys who appear before it"); <u>Trust Corp. v. Piper Aircraft Corp.</u>, 701 F.2d 85, 87 (9th Cir. 1983) (same); <u>United States v. Agosto</u>, 675 F.2d 965, 969 (8th Cir. 1982) (same). For this reason, we have emphasized that "[a] motion to disqualify counsel is the proper method for a party-litigant to bring the issues of conflict of interest or breach of ethical duties to the attention of the court." <u>Musicus</u>, 621 F.2d at 744. We recognize of course that disqualification motions may be used as "procedural weapons" to advance purely tactical purposes. But we do not believe that a priori assumptions concerning the motivations underlying disqualification motions in general justify a more relaxed ethical rule. Our prior cases disclose that a careful and exacting application of the rules in each case will separate proper and improper disqualification motions.

Our rejection of the "taint" standard finds additional support in the questionable nature of the assumptions underlying the test. First, the "taint" standard rests on a belief that "ethical conflicts surfacing during a litigation are generally better addressed by the 'comprehensive disciplinary machinery' of the state and federal bar." <u>Armstrong</u>, 625 F.2d at 446 (quoting

11

<u>Nyquist</u>, 590 F.2d at 1246)).  It is not not clear that the vitality of state enforcement is relevant to the judicial duty of the federal courts to clean its own house.  Policy aside, it is equally uncertain that the disciplinary boards have performed this role.  Moreover, clients and fellow attorneys have little incentive to file formal complaints with disciplinary boards, and the evidence suggests that they in fact do not.  This is especially true in cases of alleged conflicts of interest.  <u>See</u> David B. Wilkins, <u>Who Should Regulate Lawyers?</u>, 105 Harv. L. Rev. 799, 827-28 (1992); Note, <u>Developments in the Law--Conflicts of Interest in the Legal Profession</u>, 94 Harv. L. Rev. 1244, 1496-1500 (1981).  To a very large extent, unless a conflict is addressed by courts upon a motion for disqualification, it may not be addressed at all.  More to the point, it is our business--our responsibility.

Second, we believe that today there is less reason to suspect tactical motivations behind disqualification motions than at the time the "taint" standard was initially formulated in the 1970's.  This is not due to any moral transformation of the bar, but to the relative absence of tactical advantages that might be secured by disqualification orders under today's law.  At that time, disqualification orders were immediately appealable; the greatest tactical advantage offered by these motions was delay, as the trial proceedings were halted while the motion went up on appeal.  <u>See, e.g.</u>, <u>Nyquist</u>, 590 F.2d at 1246.  Under the <u>Firestone</u> regime, however, disqualification motions are not appealable prior to final judgment, thus severely limiting any advantages a party might have

achieved through delay.  See Armstrong, 625 F.2d at 452 n.2 (Newman, J., concurring in part and dissenting in part).

Accordingly, we will rigorously apply the relevant ethical standards in reviewing American's disqualification motion, just as we have done in the past.  See, e.g., Johnston v. Harris County Flood Control Dist., 869 F.2d 1565, 1569 (5th Cir. 1989); Doe v. A Corp., 709 F.2d 1043, 1046 (5th Cir. 1983); In re Corrugated Container Antitrust Litigation, 659 F.2d 1341 (5th Cir. Unit A Oct. 1981); Duncan v. Merrill Lynch Pierce, Fenner & Smith, Inc., 646 F.2d 1020 (5th Cir. Unit B June 1981).  We will now examine the three arguments offered by American in support of its motion to disqualify Vinson & Elkins from representing Northwest.

IV

American first argues that VE must be disqualified from representing Northwest because a law firm may not switch sides in the same case.  According to American, a binding attorney-client relationship between VE and American was formed when Alison Smith, a VE partner, agreed to represent American on June 10.  VE's withdrawal from the American representation and acceptance of the Northwest representation on June 11 was a switch of sides in the same case, a clear violation of legal ethics.

Texas Rule 1.06(a) provides that "[a] lawyer shall not represent opposing parties to a litigation."  As American indicates, this rule applies even in cases where an attorney-client relationship has not been formed: A lawyer may not "switch[] sides and represent[] a party whose interests are adverse to a person who

13

sought in good faith to retain the lawyer." Texas Rule 1.09 Comment 4A; see also Hazard & Hodes, The Law of Lawyering § 1.9:111 (1991). The parties agree that Alison Smith agreed to represent American on behalf of VE on June 10, and that Harry Reasoner formally agreed to represent Northwest on June 11. There are significant differences, however, on several points that bear on the dispositive question of whether American sought to retain VE in good faith.

On June 5, 1992, Northwest, through Joe Jamail, spoke to Harry Reasoner, managing partner of VE, about the possibility of VE serving as Northwest's co-counsel in a suit against American. After checking to see whether American was a current client and reviewing the matters that VE had handled for American in the past, Reasoner promised Jamail that VE would accept no other representation of an airline until he had the chance to discuss the matter further.

On June 9, David Schwarte of American, after first attempting to reach Reasoner, called Alison Smith, another VE partner. Schwarte asked Smith if VE would represent American in a suit that Continental had filed against it in Galveston. Unaware of the previous discussion between Jamail and Reasoner, Smith stated that she would be "delighted" to take on the case, but added that she would first have to run a conflicts check. American sent VE copies of the complaints filed against it later that day.

Smith called Schwarte at around 9:00 a.m. the next morning, June 10. When Smith stated that the conflicts question had not yet

14

been resolved, Schwarte asked if there was a problem with Northwest. Smith responded that no such conflict was apparent. Smith and Schwarte then discussed American's possible litigation strategy, focusing on American's desire to transfer the Galveston case to Chicago.

A disputed conversation between David Boies of Cravath, Swaine & Moore, lead counsel for Continental, and Ira Millstein of Weil, Gotshal & Manges, lead counsel for American, occurred at about 9:30 a.m. According to Boies, Millstein stated that he hoped to retain VE to represent American in the Galveston case. Boies responded that this probably was not possible, for it was his understanding that VE would be representing Northwest in a suit against American. Millstein, however, asserts that he told Boies that VE would be representing American in Galveston, and that Boies responded that VE might have a conflict with Northwest, not that VE was going to sue American on Northwest's behalf.

At 10:30 a.m., Smith informed Schwarte that there were no conflicts that might prevent VE from representing American. Upon hearing this, Schwarte asked Smith if there was any reason why "we" could not begin to act as a team. Smith responded that she did not see why not. The two again spoke of American's desire to transfer the Galveston case to Chicago. Schwarte asked Smith to begin thinking about this question and told her that he would send her a memorandum on the subject prepared by Weil, Gotshal attorneys. After the call, Smith left Reasoner a note in his office, stating

15

that she had accepted the American representation in the Galveston case.

Reasoner learned of Smith's acceptance of the American representation when he called his office at around 12:30 p.m. He advised Smith to explain to Schwarte that until Smith and Reasoner were able to discuss the matter, it was uncertain whether VE would be able to accept. Smith called Schwarte at 2:20 p.m. The contents of this conversation are in dispute. According to Smith, she told Schwarte that Reasoner had informed her that there was a problem with VE representing American. Schwarte responded that he was not surprised, for he had learned from Millstein that Reasoner had spoken to Northwest about suing American. According to Schwarte, however, Smith stated only that she had received a "cryptic note" from Reasoner indicating that "there might be a problem with Northwest." Schwarte swears that he made no mention of the possibility that VE might represent Northwest. At 3:45 p.m., VE received a copy of the memorandum prepared by Weil, Gotshal that Smith and Schwarte had discussed earlier.

Schwarte and Smith spoke again at 5:30 p.m. Smith informed Schwarte that the "problem with Northwest" had not yet been resolved. Schwarte stated that he needed to know as soon as possible in order to make other arrangements if it turned out that VE could not represent American. At 5:45 p.m., Reasoner told Smith that he planned to read the complaints in the case and would speak to American the next day. Smith called Schwarte to convey this information.

16

Northwest alleges that Irv Terrell, a partner at Baker & Botts, informed Joe Jamail this same afternoon that Baker & Botts would be representing American. Both Terrell and Schwarte, however, sharply contradict this account, asserting that American did not retain Baker & Botts until the afternoon of June 11, after VE told American that it would be representing Northwest.

The next afternoon, June 11, Reasoner and Jamail agreed that VE would serve as co-counsel for Northwest. Reasoner then called various members of American's legal team with this news. Millstein at this time asked Reasoner if he could recommend other Houston counsel. Reasoner told him that Baker & Botts would be a good choice. On Reasoner's instructions, Smith returned unread the Weil, Gotshal memorandum she had received the day before. According to American, American retained Baker & Botts later that afternoon.

The parties' respective accounts of these events diverge at several significant points. The rule barring lawyers from switching sides in the same case applies only where the complaining party sought in good faith to retain the lawyer. Texas Rule 1.09 Comment 4A. Northwest's version of events might lead a court to question American's good faith. According to Northwest, American's lead counsel was informed that VE would be representing Northwest in a suit against American before Alison Smith, who, unlike American, had no knowledge of VE's previous commitment to Northwest, agreed to represent American. Northwest also contends that American hired Baker & Botts during the afternoon of June 10,

17

before VE's final decision that it would not represent American. Northwest alleges that American sent VE the confidential memorandum prepared by Weil, Gotshal after these two events, that is, with knowledge that VE would likely be representing Northwest and after it had hired Baker & Botts. These alleged facts, if accepted as true, might establish that American's efforts were motivated primarily by a desire not to secure representation from VE, but to ensure that VE would not, or could not, represent Northwest.

American, of course, contests Northwest's account, insisting that it had no knowledge of VE's prior commitment to Northwest and that it hired Baker & Botts on June 11, only after it was informed that VE would be representing Northwest. When American learned of VE's commitment to Northwest is a factual issue crucial to determining whether American sought VE's representation in good faith, as Texas Rule 1.06 requires. The district court made no factual findings on this issue. We need not remand for further fact finding because we hold that VE must be disqualified on other grounds.

V

American's final two contentions rest on VE's prior representations of the airline in antitrust matters. American contends that VE must be disqualified because VE has represented American in matters substantially related to the present case and VE's representation of Northwest in this case will likely involve the use to American's disadvantage of confidential information obtained during this earlier representation. We will first discuss

18

the applicable ethical standards.  We will then apply these standards to the prior representations alleged by American to warrant VE's disqualification.

A.

American contends that VE's prior representations of American make disqualification appropriate under this court's precedents and the Texas Rules.  Our review in previous cases involving prior representations has been governed by the "substantial relationship" test:

> A party seeking to disqualify opposing counsel on the ground of a former representation must establish two elements:  1) an actual attorney-client relationship between the moving party and the attorney he seeks to disqualify and 2) a substantial relationship between the subject matter of the former and present representations.

Johnston v. Harris County Flood Control Dist., 869 F.2d 1565, 1569 (5th Cir. 1989); In re Corrugated Container Antitrust Litigation, 659 F.2d 1341, 1345 (5th Cir. 1981); Duncan v. Merrill Lynch, Pierce, Fenner & Smith, 646 F.2d 1020, 1028 (5th Cir.), cert. denied, 454 U.S. 895 (1981).  Because it is not disputed that VE represented American in the matters under consideration, the sole issue is whether these prior representations are substantially related to the present case.  Our inquiry may be narrowed to this single question because the substantial relationship test is governed by an irrebuttable presumption.  Once it is established that the prior matters are substantially related to the present case, "the court will irrebuttably presume that relevant confidential information was disclosed during the former period of

19

representation." <u>Duncan</u>, 646 F.2d at 1028; <u>Corrugated</u>, 659 F.2d at 1347.[1]

The test is categorical in requiring disqualification upon the establishment of a substantial relationship between past and current representations. But we have never applied the test in a mechanical way that might "prevent[] an attorney from ever representing an interest adverse to that of a former client." <u>Duncan</u>, 646 F.2d at 1027-28. Rather, a substantial relationship may be found only after "the moving party delineates with specificity the subject matters, issues and causes of action" common to prior and current representations and the court engages in a "'painstaking analysis of the facts and precise application of precedent.'" <u>Duncan</u>, 646 F.2d at 1029 (quoting <u>Brennan's, Inc. v. Brennan's Restaurants, Inc.</u>, 590 F.2d 168, 174 (5th Cir. 1979)). Finally, the party seeking disqualification bears the burden of proving that the present and prior representations are substantially related. <u>Duncan</u>, 646 F.2d at 1028.

This circuit adopted the substantial relationship test before the promulgation of the Rules of Professional Conduct. We must decide the application of the substantial relationship test under these new Rules. Texas Rule 1.09 provides in relevant part:

(a) Without prior consent, a lawyer who personally has formally represented a client in a matter shall not thereafter represent another person in a matter adverse to the former client:

---

[1] A second irrebuttable presumption is that confidences obtained by an individual lawyer will be shared with the other members of his firm. <u>See</u> <u>Corrugated</u>, 659 F.2d at 1346. This presumption is not at issue in this case, for all of the VE lawyers involved have previously represented American.

. . .

    (2)  if the representation in reasonable probability will involve a violation of Rule 1.05; or

    (3)  if it is the same or a substantially related matter.

Rule 1.09(a)(2) incorporates Rule 1.05, which prohibits a lawyer's use of confidential information obtained from a former client to that former client's disadvantage. Rule 1.09 thus on its face forbids a lawyer to appear against a former client if the current representation in reasonable probability will involve the use of confidential information <u>or</u> if the current matter is substantially related to the matters in which the lawyer has represented the former client.[2]

In providing two distinct grounds for disqualification, the Rules expand the protections for former clients beyond those afforded by the substantial relationship test. The Rules are not, however, broader than the protections provided by our precedents. While the focus of our cases has been on the substantial relationship test, we have indicated that a former client could

---

    [2]  ABA Rule 1.9 is identical to Texas Rule 1.09 in all important respects:

> (a) A lawyer who has formally represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation

. . . .

> (c) A lawyer who has formally represented a client in a matter . . . shall not thereafter:
> (1) use information relating to the representation to the disadvantage of the former client . . . .

ABA Rule 1.9.

21

also disqualify counsel by showing that his former attorney possessed relevant confidential information in the manner contemplated by Rule 1.09(a)(2). As Duncan, for example, stated: "[The moving party may disqualify counsel on the basis of prior representations] either by establishing that the present and previous representations are substantially related or by pointing to specific instances where it revealed relevant confidential information regarding its practices and procedures." Duncan, 646 F.2d at 1032. Thus, it does not appear that the Texas Rules make material addition to the basic approach we have used in the past.

But do the Rules take something away? That is, do the Rules offer less protection to former clients than our precedents? Northwest offers two related arguments on this score. First, Northwest contends that a substantial relationship between past and current matters exists only where the two cases are so closely related that the risk of adverse use of the former client's confidences threatens to "taint" the trial. Northwest also argues that a close relation between a past and current representation is irrelevant if the attorney relied on publicly available information in advising the former client. These two arguments are rooted in Northwest's larger assertion that the substantial relationship test is solely concerned with protecting a former client's confidences.

Northwest offers three distinct grounds in support of its "taint" standard. It first makes a brief attempt to locate this more demanding standard in Duncan. According to Northwest, Duncan provides that a party may establish a substantial relationship

22

between past and current representations only by demonstrating that the two matters are so closely related that there is a "genuine threat that confidences revealed to his former counsel will be divulged to his present adversary." Duncan, 646 F.2d at 1028. Duncan, however, stands for a different proposition, for we held that a "genuine threat" of adverse use of confidences is established by showing that a prior representation is substantially related to the present case. Id. Under Duncan, a party demonstrates a "genuine threat" by establishing a substantial relationship between past and present cases, not, as Northwest would have it, the other way around.

Northwest's other two arguments rest on its interpretation of Texas Rule 1.09's substantial relationship language. First, Northwest contends that the commentary to Rule 1.09 makes "abundantly clear" that the Rule's substantial relationship language is directed to "actual and genuine threats to the integrity of the trial process." Comment 8 to Rule 1.09 provides:

> Although not required to do so by Rule 1.05 or this Rule, some courts, as a procedural decision, disqualify a lawyer for representing a present client against a former client when the subject matter of the present representation is so closely related to the subject matter of the prior representation that confidences obtained from the former client might be useful in the representation of the present client. See Comment 17 to Rule 1.06.

Comment 17 provides that alleged conflicts should be raised by an opposing party only where the alleged "conflict is such as clearly to call in question the fair or efficient administration of justice." Northwest concludes that this commentary reveals that

23

"the substantial relationship language of Rule 1.09 is bottomed on a concern about the actual fairness of the proceedings in which disqualification is sought."

Northwest also contends that the Texas Rules' conscious omission of the "appearance of impropriety" standard contained in Canon 9 of the Model Code independently establishes "taint" as the appropriate disqualification standard. Northwest points out that some of our broader substantial relationship cases, notably In re Corrugated Container Antitrust Litigation, 659 F.2d 1341 (5th Cir. 1981), were decided under Canon 9. Northwest asserts that Corrugated's broad language was intimately tied to Canon 9's "appearance of impropriety" standard. Since the Texas Rules eliminated this rule, "disqualification is no longer appropriate unless counsel's continued involvement threatens to taint the underlying trial: a mere appearance of impropriety will not suffice."

We reject both of Northwest's arguments. A party seeking to disqualify counsel under the substantial relationship test need not prove that the past and present matters are so similar that a lawyer's continued involvement threatens to taint the trial. Rather, the former client must demonstrate that the two matters are substantially related. Second, we adhere to our precedents in refusing to reduce the concerns underlying the substantial relationship test to a client's interest in preserving his confidential information. The second fundamental concern protected by the test is not the public interest in lawyers avoiding "even

24

the appearance of impropriety," but the client's interest in the loyalty of his attorney.

Northwest's argument that the Texas Rules' commentary bottoms Rule 1.09's substantial relationship language on a concern for "actual fairness" rests on its general interpretation of the Texas Rules. Northwest suggests that courts' use of disciplinary standards in disqualification matters is "understandable in courts that have not yet developed their own specific procedural disqualification rules or standards." Courts may borrow from the rules, with two important qualifications: "First, any violation of a disciplinary standard must be demonstrated by movant to have been actually prejudicial to movant; and, second, disqualification should be denied unless the litigation will be 'tainted' by the continued participation of a lawyer or firm that may have violated a disciplinary standard."

This argument is closely related to Northwest's larger assertion that the Texas Rules are "guides" for courts and are not to be "literally" applied in disqualification cases. We addressed, and rejected, this general argument in Part III. We understand this particular argument concerning the substantial relationship test to be something more than a reiteration of this general point. Northwest's initial argument was that a breach of an ethical standard does not by itself require disqualification; an additional showing of taint is needed. Here, Northwest appears to concede that such a breach requires disqualification, but asserts that the rule barring representation in substantially related matters is not

25

violated unless the cases are so similar that there is a genuine threat of taint. We reject this argument. The substantial relationship test, as applied in this circuit and elsewhere, does not have its source in disciplinary rules. To the contrary, the test was developed at common law. Our precedents did not rely on the Model Code or Model Rules in formulating the substantial relationship test, but on the landmark T.C. Theatre Corp v. Warner Bros. Pictures, Inc., 113 F.Supp. 265 (S.D.N.Y. 1953), which predated the Model Code and of course the Model Rules. See, e.g., Wilson P. Abraham Construction Corp. v. Armco Steel Corp., 559 F.2d 250, 252 (5th Cir. 1977); In re Yarn Processing Patent Validity Litigation, 530 F.2d 83, 89 (5th Cir. 1976).

The actual development of Rule 1.09's substantial relationship provision is the just the opposite of the version Northwest gives. The initial drafts of both the ABA and Texas Rules did not include a rule barring representation in substantially related matters. In both cases, the substantial relationship rule was added as a reflection of case law. See Robert P. Schuwerk & John F. Sutton, Jr., A Guide to the Texas Disciplinary Rules of Professional Conduct, 27A Hous. L. Rev. 1, 152 n.20, 153 n.34 (1990); Note, In Defense of the Double Standard in the Rules of Ethics: A Critical Reevaluation of the Chinese Wall and Vicarious Disqualification, 20 U. Mich. J.L. Ref. 245, 257 & n.66 (1986) (ABA Rules). Schuwerk & Sutton's account is instructive:

> [T]he Texas committee originally avoided [the substantial related matter language] in proposed Texas Rule 1.09 . . . . Subsequently, however, a difficulty emerged as a result of failure to employ the substantial relationship

26

> test in a disciplinary context. A lawyer might accept or
> continue employment in a matter against a former client
> believing (correctly) that no disciplinary violation was
> involved under the initially proposed version of Rule
> 1.09, only to be disqualified subsequently--perhaps at
> great cost and expenses to the client--by a court
> employing the traditional substantial relationship test
> . . . . The drafting committee, therefore, concluded
> that the danger of having its narrowly drawn Rule 1.09
> turn into a trap for the unwary outweighed its objections
> to the substantial relationship test as a standard of
> discipline. It would be in keeping with the committee's
> thinking, however, to construe "substantially related"
> narrowly for <u>disciplinary purposes</u>.

Schuwerk & Sutton, <u>supra</u>, at 153 n.34 (emphasis added); <u>see also</u> Rule 1.09 Comment 9.

As this account suggests, the difficulty posed by Rule 1.09 does not concern the "literal and mechanical" application of a disciplinary rule in disqualification cases. Rather, the concern is the transfer of the substantial relationship test developed by courts to the disciplinary context. <u>See also</u> Charles W. Wolfram, Modern Legal Ethics 366 (1986) (discussing ABA Rules' "adoption of the substantial relationship standard as a disciplinary rule"). Contrary to Northwest's contentions, the Rules did not supplant, but adopted, the common law substantial relationship test. The argument thus provides no basis for applying the substantial relationship test through the "taint" filter it proposes.

Northwest's argument concerning the Rules' deletion of Canon 9's appearance of impropriety standard has more purchase. Northwest argues that the Model Rules' omission of the "appearance of impropriety" standard contained in the Model Code indicates that the substantial relationship test should be solely concerned with ensuring "actual fairness" in the proceedings. But Northwest does

27

not mention loyalty, itself a substantial addition under the Rules. As several commentators have noted, the Model Code provided no express protection to the former client's interest in loyalty. See, e.g., Geoffrey C. Hazard & W. William Hodes, The Law of Lawyering 292 (1991); Wolfram, supra, at 363 (1986). This interest is singled out only under the Rules. See Texas Rule 1.06 Comment 1 ("Loyalty is an essential element in the lawyer's relationship to a client"); ABA Rule 1.9 Comment ("The second aspect of loyalty to a client is the lawyer's obligation to decline subsequent representations involving positions adverse to a former client arising in substantially related matters"); Hazard & Hodes, supra, at 292-93; Wolfram, supra, at 361; Sutton, supra, at 147; Stephen Gillers, What We Talked About When We Talked About Ethics: A Critical View of the Model Rules, 46 Ohio St. L.J. 243, 250-55 (1985).

The Rules' express establishment of loyalty and confidentiality as the interests protected by the substantial relationship test is a return to T.C. Theatre Corp. v. Warner Bros. Pictures, Inc., 113 F.Supp. 265, 268-69 (S.D.N.Y. 1953), where the court held that once it is established that the two representations are substantially related,

> [t]he court will assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation. It will not inquire into their nature and extent. Only in this manner can the lawyer's duty of absolute fidelity be enforced and the spirit of the rule relating to privileged communications be maintained.

Id. (emphasis added).

28

We believe the replacement of the "appearance of impropriety" with loyalty provides no basis for altering the substantial relationship test found in our precedents. This is because we read our cases involving Canon 9 as protecting the same interest in loyalty now explicitly provided for under the Rules. As the Comment to ABA Rule 1.9 notes, "[r]epresentation adverse to a former client was sometimes dealt with under the rubric of Canon 9 of the Model Code." This was true of this court as well as others.

The link between loyalty and the appearance of impropriety is most evident in Brennan's Inc. v. Brennan's Restaurants, Inc., 590 F.2d 168 (5th Cir. 1979), where the court disqualified a former counsel even though there was no chance that confidential information might be used against the former client. We held:

> The obligation of an attorney not to misuse information acquired in the course of representation serves to vindicate the trust and reliance that clients place in their attorneys. A client would feel wronged if an opponent prevailed against him with the aid of an attorney who formerly represented the clients in the same matter. As the court recognized in E.F. Hutton & Co. v. Brown, 305 F. Supp. 371, 395 (S.D. Tex. 1969), this would undermine public confidence in the legal system as a means for adjudicating disputes.

590 F.2d at 172. As Professors Hazard and Koniak observe: "In Brennan's, the Court recognizes two underlying concerns of the substantial relationship test: the duty to preserve confidences and the duty of loyalty to a former client." Geoffrey C. Hazard & Susan P. Koniak, The Law and Ethics of Lawyering 658 (1990). See also E.F. Hutton & Company v. Brown, 305 F.Supp. 371, 395 (S.D. Tex. 1969) ("If courts protect only a client's disclosures to his attorney, and fail to safeguard the attorney-client relationship

29

itself--a relationship which must be one of trust and reliance-- they can only undermine the public's confidence in the legal system as a means for adjudicating disputes."); Duncan, 646 F.2d at 1027 ("the integrity of the judicial system would be sullied if courts tolerated such abuses by those who profess and owe undivided loyalty to their clients") In re Yarn Processing Patent Validity Litigation, 530 F.2d 83, 90 (5th Cir. 1976) (prohibition of representation of conflicting interests rests on lawyers duties of loyalty and confidentiality); Cf. In re Corn Derivatives Antitrust Litigation, 748 F.2d 157, 161-62 (3d Cir. 1984); In re Agent Orange Product Liability Litigation, 800 F.2d 14, 17-18 (2d Cir. 1986).

As these decisions suggest, the existence of a lawyer's duty of loyalty means that the substantial relationship test is not solely concerned with the adverse use of confidential information. What the duty of loyalty adds to the duty of confidentiality is clearly presented in Corrugated:

> Container's complaint is that the district court failed to explain how [the lawyer's] advice would be relevant or substantially related to this action.  The advice does not need to be "relevant" in the evidentiary sense to be "substantially related."  It need only be akin to the present action in a way reasonable persons would understand as important to the issues involved.

Corrugated, 659 F.2d at 1346 (emphasis added).

We emphasize "advice" because a court solely concerned with the possible adverse use of confidential information might not be obliged to protect legal advice.  As at least one court has noted, "the concern of the Confidentiality Rule and the case law is the protection of what the client tells his attorney, not what the

30

attorney tells the client." <u>Laker Airways Ltd. v. Pan American World Airways</u>, 103 F.R.D. 22, 40 (D.D.C. 1984) (emphasis added). We agree that the confidentiality rule was historically concerned with disclosures, but we are also persuaded that the substantial relationship test cannot be reduced to a confidentiality rule. <u>See</u> Texas Rule 1.07. That is, because the substantial relationship test is concerned with both a lawyer's duty of confidentiality <u>and</u> his duty of loyalty, a lawyer who has given advice in a substantially related matter must be disqualified, whether or not he has gained confidences.

We agree with Northwest that the "appearance of impropriety" has no relevance to our probe of ethical restraints. It does not follow, however, that the focus of the substantial relationship test now becomes the "actual fairness" of the trial. Such a shift is premised on the view that eliminating the appearance of impropriety reduces the substantial relationship test to a concern for confidential information. We believe that such a reduction is precluded by a lawyer's duty of loyalty. Because Canon 9 was primarily interpreted by the court as a way to protect a client's loyalty interests, we believe that our application of the substantial relationship test under the Rules is the same as it was under the Code.

We believe that disqualification of VE would be appropriate even under the relaxed "actual prejudice" or "taint" standard Northwest urges this court to adopt. As we explain below, the relationship between the matters in which VE has represented

31

American and the instant litigation is so intimate that VE's continued involvement does threaten to compromise the integrity of the present trial. Our continued adherence to the substantial relationship test rests on our belief that the ethical prohibition against successive representation cannot be reduced to the protection of clients' confidences, let alone protecting these confidences only to the extent that their adverse use might "taint" the trial, as Northwest's proposal would provide. Rather, a lawyer's obligation of confidentiality must be seen as part of the lawyer's primary duty of loyalty, a duty that is not exhausted by the preservation of a former client's secrets. We believe that a single inquiry into whether past and present representations are substantially related provides the best means to protect these two interests of clients.

Because it recognizes these two interests, the substantial relationship test serves not only to ensure the fairness of particular trials, but also to safeguard the integrity of the attorney-client relationship. If the sole focus of the substantial relationship test was the possible adverse use of confidences, prior representations in which the attorney advised the client but received no confidential information would not warrant disqualification. Even if the subject matter of case one and case two is identical, a former client's adversary is not inevitably advantaged by virtue of his attorney's prior representation of the client. And yet this court has held that the provision of legal advice on a substantially related matter by itself requires

32

disqualification.  See Corrugated, 659 F.2d at 1346-47; Brennan's, 590 F.2d at 171-72.

Disqualification rules not only preserve the purity of particular trials but also unavoidably affect relationships among attorneys and clients in general.  This court bars attorneys from appearing in substantially related matters not only to protect individual parties against the adverse use of information but also "to aid the frank exchange between attorney and client."  Wilson P. Abraham Const. Corp. v. Armco Steel Corp., 559 F.2d 250, 252 (5th Cir. 1977); see also In re Yarn Processing Patent Validity Litigation, 530 F.2d 83, 90 (5th Cir. 1976).  A post hoc inquiry into whether a particular attorney's involvement in a particular suit might "taint" the case in no way provides the breadth and "predictability of confidence [that] is central to the role of the attorney."  In re LTV Securities Litigation, 89 F.R.D. 595, 602 (N.D. Tex. 1981); cf. Upjohn Co. v. United States, 101 S.Ct. 677, 683-84 (1981) (recognizing that confidentiality is essential to frank discussions between attorneys and clients or client's employees).  The trust a lawyer's duty of loyalty inspires in clients encourages them freely to confide in the lawyer and freely to rely on the advice provided by the lawyer.  The substantial relationship test aims to protect the adversary process but also, or as part of this concern, seeks to provide conditions for the attorney-client relationship. As such, our central concern remains the application of the rule to the actual relationship of lawyers and clients, but in the process we consider also what they might

have done.  What credence, for example, might American have attached to VE's December 1990 counsel that the airline's interests would be better served by postponing the acquisition of Continental for at least a year if it even suspected that VE itself might soon be representing one of its competitors in a suit against American, charging that it had abused its market power to the detriment of competition in the airline passenger service markets?

These considerations preclude us from accepting Northwest's final argument.  Northwest claims that because VE relied primarily on public, not confidential, information in advising American, these prior matters cannot be considered substantially related to the present case.  It contends that "'[f]acts that are community knowledge or that are not material to a determination of the issues litigated do not constitute "matters involved" within the meaning of the law' governing the substantial relationship test" (quoting J.K. & Susie L. Wadley Research Inst. & Blood Bank v. Morris, 776 S.W.2d 271, 278 (Tex. App.--Dallas 1989, orig. proceeding)).  The record sharply contradicts Northwest's claim that all of the material obtained by VE was publicly available.  As we discuss below, VE was privy to many of American's secrets.  But Northwest's argument would fail even if it could show that all of the information provided by American was public knowledge.  Our precedents, the Texas Rules, and the ABA Rules all reject the position Northwest advances.  This court has held that "[i]nformation [provided by a client] is sheltered from use by the attorney against his client by virtue of the existence of the

attorney-client relationship. This is true without regard to whether someone else may be privy to it." <u>Brennan's, Inc. v. Brennan's Restaurants, Inc.</u>, 590 F.2d 168, 172 (5th Cir. 1979). "'This ethical precept . . . exists without regard to the nature or source of information or the fact that others share the knowledge.'" <u>Id.</u> (quoting Model Code EC 4-4); <u>Doe v. A Corp.</u>, 709 F.2d 1043, 1046 (5th Cir. 1983) (same). <u>See also</u> <u>Emle Industries, Inc. v. Glen Raven Mills, Inc.</u>, 478 F.2d 562, 572-73 (2d Cir. 1973) ("[t]he client's privilege in confidential information disclosed to his attorney `is not nullified by the fact that the circumstances to be disclosed are part of a public record, or that there are other available sources for such information'" quoting Henry S. Drinker, <u>Legal Ethics</u> 135 (1953); <u>NCK Organization Ltd. v. Bregman</u>, 542 F.2d 128, 133 (2d Cir. 1976) (same).

The Texas and ABA Rules supply the same standard. The Rules do contain an exception for public information, but in each case this exception applies only to the provision prohibiting the use of confidential information, not the rule prohibiting successive representation in substantially related matters. Texas Rule 1.05 provides that "a lawyer shall not knowingly

> (3) [u]se confidential information of a former client to the disadvantage of the former client after the representation is concluded unless the former client consents after consultation or <u>the confidential information has become generally known</u>."

Texas Rule 1.05 (b) (3) (emphasis added). This provision, however, is incorporated by Rule 1.09(a) (2), not the substantial relationship rule contained in Rule 1.09 (a) (3). The same

35

distinction exists between Rules 1.9 (a) and 1.9(c) of the ABA Rules, as commentators have indicated.  See, e.g., Charles W. Wolfram, Modern Legal Ethics 360, 365 (1986).

We believe that our application of the substantial relationship test under the Rules is the same as it was under the Code.  Thus, as in our past cases, our inquiry is limited to the single question of whether VE's prior representations of American are substantially related to the present case.

B.

VE represented American in several matters in recent years, earning fees in excess of $676,000.  Our review will be limited to three of VE's prior representations.  VE defended American in two suits brought by Continental in Texas.  The focus of each case, as in the larger California litigation to which they were related, was SABRE, American's computerized reservation system.  The first case, System One Direct Access, Inc v. American Airlines Inc., was an antitrust suit brought by a Continental affiliate in Houston federal court.  VE served as counsel from November 1987 until withdrawing in July 1988 when the case was transferred to Dallas.

VE also served as lead counsel in Continental Airlines, Inc. v. American Airlines, Inc., a Texas state court case.  Continental alleged that American had breached contractual relationships and committed other acts of misconduct in operating its CRS.  VE represented American from March 1989 until the case was settled as part of the global settlement between Continental and American in May 1990.

36

In late 1990, VE advised American concerning whether the Antitrust Division of the Department of Justice would approve "Project Armadillo," a proposed acquisition of Continental Airlines. The primary question was whether a merger of the two airlines would run afoul of the Department's merger guidelines. The representation ended in January 1991, when American apparently chose not to pursue the merger.

The two Texas cases were related and subsidiary to a larger suit by Continental and Northwest, among others, against American and United Airlines in California federal district court in 1985. Continental and Northwest charged American and United with monopolization of both computerized reservation systems and various air transportation markets.[3] In particular, they charged predatory pricing of CRS systems and air transportation, closely related to the claim advanced by Northwest and Continental here.

American asserts, and Northwest appears to concede, that the California case is substantially related to the present case. However, Gibson, Dunn & Crutcher, not VE, represented American in California, so the similarities between the California case and the present one are no basis for disqualification. American's argument that VE's prior representations are substantially related to this case rests largely then upon its claim that the Texas cases are substantially related to the California case.

_____

[3]  See In re Air Passenger Computer Reservations Systems Antitrust Litigation, 694 F. Supp. 1443 (C.D. Cal. 1988); aff'd Alaska Airlines, Inc. v. United Airlines, Inc., 948 F.2d 536 (9th Cir. 1991), cert. denied, 112 S.Ct. 1603 (1992).

Northwest argues that the Texas cases are not substantially related to this case because the allegations in these cases, unlike in California, pertained only to CRS services, not air transportation services. We disagree. While the focus was certainly CRS systems, the plaintiffs also raised claims involving air transportation markets. Moreover, as we will explain, the Texas cases involved two particular matters at issue in the present case.

(1) Fort Bend

Fort Bend involved the state-law claims over which the California district court, upon American's motion to dismiss, had declined to exercise pendent jurisdiction. Continental alleged breach of contract, duress, tortious interference, misrepresentation, and violation of the Texas Deceptive Trade Practices Act. As in California, Continental's petition focused on American's CRS operations. But also as in California, Continental asserted that American's power in the CRS market could not be considered apart from its position in the air transportation market. Continental claimed that "American and United, by leveraging their dominance as air carriers and the enormous secret profits they received from bias-diverted revenues, established themselves as the dominant CRS providers." Continental charged that American, having achieved dominance in the CRS market, in turn used SABRE to "exclude[] Continental in whole or in part from specific airline passenger markets."

Continental's claims were stated in a similar manner. Continental claimed that American had breached its contract by "secretly accessing TXI's [a Continental affiliate] data base and using it to study passenger traffic flow through the Dallas/Fort Worth hub. Reports developed by American through the use of the TXI data contributed to American's successful exclusion of TXI from the Dallas/Fort Worth hub and elsewhere." In its tortious interference claim Continental alleged that American had "interfered with Continental's prospective contractual relations with its travel agents and air passengers," causing damages in the form of "lost airline bookings through bias diversions and total exclusion from certain air passenger markets." Finally, Continental noted that the California district court had cited American President Robert Crandall's alleged 1982 price-fixing solicitation of Braniff as "a textbook example of anticompetitive conduct" in ruling that "Continental could proceed to trial on its claim that American illegally attempted to monopolize the Dallas-Fort Worth airport."

Continental's allegations and its reference to Crandall's alleged price-fixing solicitation apparently supplied the basis for the belief among VE and Gibson, Dunn lawyers that American's alleged attempted monopolization of DFW would be at issue in the case and that Continental might seek to introduce the price-fixing incident as evidence on this score. As such, they believed that Fort Bend was intimately related to the California case. For example, a VE partner stated at the time that the California and

Fort Bend suits "involve the same parties, the same alleged acts, and the same alleged damages."  Another VE lawyer noted that the two suits could be seen as "largely identical":  "[The Fort Bend petition] asserts that AA and UA used their purported CRS monopolies to obtain monopoly power in certain air transportation markets.  This claim is intertwined with both the CRS monopolization and DFW attempted monopolization claims pending in California."  The perceived similarities between Fort Bend and the California case led VE and Gibson, Dunn to spend considerable time exploring the possibility of an abatement of the Fort Bend case until the California proceedings had concluded.

VE argues that Crandall's alleged price-fixing solicitation and Continental's claim that American had used its CRS to exclude it from the DFW market were not at issue in Fort Bend.  This contention is contradicted by the accounts of Gibson, Dunn lawyers and by notes taken by a VE lawyer during one meeting between VE and Gibson, Dunn.  While it is difficult to reconstruct a conversation from this distance, we are struck by the first two comments on the first page of notes:  1) "There is no admissible evidence of the Crandall telephone conversation on Braniff; may use it on a consequential damages theory that Continental excluded from DFW market."  2) "We should argue that the exclusion claim is being litigated in California and should not be litigated in Texas."  Given the allegations in the complaint, the statements of VE's lawyers at the time, and this evidence it is difficult to maintain that these matters were not at issue in Fort Bend.

40

The charges of monopolization of DFW and Crandall's alleged solicitation are prominently featured in Northwest's current complaint. Northwest alleges that American has monopolized or attempted to monopolize five different air transportation markets. Dallas-Fort Worth is included as an "illustrative example" in three of the five markets cited by Northwest: origin and destination city pair markets, O & D airport-airport pair markets, and O & D-based hub markets. It cannot be denied that one focus of the case will be American's DFW operations, the very market at issue in Fort Bend.

Similarly, Northwest contends in its complaint that "AA and its current chief executive officer have previously engaged in anticompetitive conduct with open contempt for the antitrust laws." Northwest prominently cites Crandall's alleged price-fixing solicitation, the same allegation that VE lawyers were charged with excluding in the Fort Bend case. VE suggested at oral argument that Crandall's alleged solicitation is not substantially related to the present case because this ten-year old incident would not be admitted as evidence. This is helpful but not dispositive. As the Corrugated court stated, the subject matter "does not need to be 'relevant' in the evidentiary sense to be 'substantially related.' It need only be akin to the present action in a way reasonable persons would understand as important to the issues involved." Corrugated, 659 F.2d at 1346. Northwest included the incident under the heading "Conduct Giving Rise to Violations Alleged" in its complaint. This is not easily explained away, especially given

41

Northwest's heavy reliance on the location of the Crandall allegation in the Fort Bend petition's "procedural history" in attempting to prove that the incident was not at issue in that case.

We are persuaded that VE's representation of American in the Fort Bend case is substantially related to the present case.

2) System One

In System One, Continental affiliate System One, a CRS vendor, charged that American had violated antitrust laws in its provision of CRS services. System One alleged that American had engaged in a variety of acts designed to exclude it from the CRS market. But as in Fort Bend, plaintiff presented the CRS and air transportation markets as inextricably linked. The System One complaint alleged that "AA has used its monopoly power in the provision of air carrier services in various geographic markets to obtain, retain, and enhance its power in the provision of CRS systems." Again, "AA has achieved its dominant position in the market for CRS services, and continues to enforce anticompetitive practices in an effort to maintain that position, not only to reap monopoly profits from the sale and use of CRS systems, but to enhance profits from the provision of air transportation services."

The record reflects extensive discovery regarding SABRE's effects on air transportation revenues. System One requested all documents relating to the "incremental revenues," the general effect of "airline ownership of a CRS on the airline's sale of air transportation services," and "any actual or possible loss of

42

revenue or other detriment to any commercial air carrier as a result of the operation or installation of SABRE." In response, American agreed to produce all documents "that discuss, study, or analyze whether, and the extent to which, any airline (including American) which owns a CRS obtains incremental airline revenue as a consequence of automating travel agencies with its CRS" as well as "documents discussing whether American has a 'premium share' of the traffic in a particular region or market and whether this is attributable to the presence of SABRE in that region or market."

In the absence of this prior litigation, there is little doubt that Northwest would seek to introduce evidence of the incremental revenues generated by SABRE in support of the predatory pricing claims it raises in this case. Northwest's General Counsel recently asserted in congressional testimony that American's ability

> to restructure and reduce its fares dramatically is directly related to American's long-term, advantageous use of its CRS . . . . DOT studies repeatedly have documented the flow of hundreds of millions of dollars of incremental revenue diverted from other carriers to American and United as a result of their CRS market power . . . [I]n a very real sense, American has launched its predatory attack on the industry using our own money.

It is the case that challenges by Northwest and Continental of American's CRS use have been earlier terminated in ways restricting their present assertion, Continental by settlement and Northwest by a final judgment. Pointing to these outcomes, VE states that it will not, because it cannot, raise any issues relating to CRS in this case. Any attempts to redress perceived CRS abuses by American will be confined, as the congressional testimony suggests,

43

to the legislature. Since American's CRS operation will not be at issue, VE contends that its representation of American on this matter cannot be substantially related to this case. Northwest in particular claims that the issues of incremental revenue and costs addressed in System One relate to CRS use and are quite different from the general airline revenue and cost issues at the center of this case.

We recognize that several possible claims relating to CRS might be barred by res judicata and we do not question Northwest's representations in this court and below that the present litigation will involve no attacks on American's CRS use. We are not persuaded, however, by Northwest's argument that a party's representation that matters in which a lawyer represented a former client cannot, or will not, be introduced in the present case precludes a court from finding these matters substantially related to the prior representations. The exact scope of categories such as "CRS matters," especially at the early stage of the litigation when motions to disqualify are often considered, is unclear, and leaves much room for good faith dispute among the parties. The party who either lost in the previous case or represented to the court that certain matters will not be raised will attempt to define the sphere of these issues narrowly, while the party who prevailed in the earlier case or filed an unsuccessful disqualification motion will naturally attempt to define the precluded matters quite broadly. In the particular case of res judicata, it places the former counsel in the position of

attempting to minimize the beneficial results of her prior representations by limiting their effect in the present case.

The facts of this case disclose how such a dispute might arise. Northwest claims that System One involved the particular matter of incremental revenues obtained by American through ownership of a CRS. Northwest states that the focus in this case will be on wholly different matters such as American's marketing strategy, ticket pricing, and general airline costs and revenues. The line between incremental revenues and general revenues, however, does not appear as distinct as VE suggests. Moreover, American hotly disputes VE's contention that discovery in System One was limited to the narrow issue of incremental revenues. To the contrary, American asserts that the VE lawyers reviewed and discussed documents relating to marketing strategy and general air transportation revenues and costs, the very matters Northwest identifies as the heart of the instant case.

There is another matter involved in System One that Northwest has indicated will be at issue in this case. Northwest must focus at trial upon barriers to entry into the relevant markets. In its complaint, Northwest lists among these barriers "the role of travel agents in the industry and incentive commissions paid by airlines to travel agents and other marketing programs and devices." Incentive or override commissions in particular were at the center of the System One case.

System One charged that American used override commissions as a means to exclude it from the CRS market: "AA conditioned the

payment to travel agents of commissions on AA ticket sales on their agreement to use the SABRE system." As System One explained, this arrangement worked especially well in those areas where American was the dominant air carrier. In connection with this claim, American agreed to produce and searched for "[d]ocuments that describe or discuss American's policies and procedures regarding participation by travel agencies in any override, special incentive or 'soft dollar' commission program offered by American." American asserts, and Northwest does not appear to contest, that VE lawyers reviewed much of this material. A VE lawyer and several VE paralegals spent more than ten weeks reviewing documents at American's offices. Gibson, Dunn lawyers who were involved claim that a VE lawyer personally reviewed documents relating to marketing strategy and air transportation issues. The materials submitted with the Gibson, Dunn affidavits provide additional support for these claims. VE's description of its work on the case does little to contradict these accounts. Its response is limited to a statement by the lawyer that he has no specific recollection of documents reviewed and that he does not believe, "given the nature of the case," that he "reviewed any documents relating to American's pricing of airline transportation."

Northwest contends that the presence of the issue of override commissions in System One and the instant case does not make the two representations substantially related. Northwest argues that the two cases are not related because in System One the commissions were alleged to be a barrier to entry into the CRS market, while

46

here they represent a barrier to entry into the air transportation market. Regardless of the direction of the block the trial must focus on the exclusionary force of CRS--its power to exclude competition in CRS is the handmaiden of its exclusionary force on airline passenger service.

We therefore find Northwest's purported distinction unavailing. Corrugated and Duncan provide that two representations need only involve the same "subject matter" in order to be substantially related. See Corrugated, supra; Duncan, supra. As the summary of the document request quoted above discloses, VE lawyers reviewed documents relating to travel agency commissions in general, not simply those documents referring to the alleged practice of tying such commissions to CRS use. A substantial relationship exists when the prior representation concerns "the particular practices and procedures which are the subject matter of [Northwest's] suit. Duncan, 646 F.2d at 1032. Both System One and the present case involve American's travel agency commission "practices and procedures." Given that the two cases sharing this "subject matter" allege similar antitrust violations, we find VE's representation of American in System One substantially related to its present representation of Northwest.

3) Project Armadillo

VE represented American most recently in "Project Armadillo," an American proposal to acquire Continental. VE provided American with antitrust analysis of the proposal, focusing on whether a merger of the two airlines could avoid challenge under the

47

Department of Justice antitrust merger guidelines. VE's representation began in late November 1990 and concluded in early January 1991, when American chose not to pursue the acquisition.

As a memorandum prepared by American explained, the Department of Justice merger guidelines' main concern is "whether the merger will likely create, enhance or facilitate the exercise of market power--the ability to raise prices to supracompetitive levels--by the remaining participants in the relevant market." Market power is more easily inferred under narrowly defined markets, and it was therefore in American's interest to avoid "[a] market definition that is improperly narrow," for this would "result in such a high level of concentration that, inevitably, a court will conclude the merger poses an incipient threat to competition."

These same issues are at the heart of the present case. Northwest alleges that American has monopolized or attempted to monopolize the national air transportation market as well as four smaller geographic markets involving city pairs and regions. Because American enjoys a greater share of particular regional markets, Northwest will no doubt attempt to prove at trial that these smaller markets are relevant. To this end, Northwest cites four instances where American has allegedly indicated that O & D and regional passenger markets are relevant markets.

VE asserts that its "narrow, limited, and brief" role in Project Armadillo cannot serve as the basis for disqualification in the present case. Northwest contends that some VE lawyers alleged by American to have worked on Project Armadillo were not in fact

48

involved. A VE memorandum summarizing the initial meeting between American and VE lawyers, however, includes a notation directing that a copy of the memo be sent to these same lawyers whose involvement in the matter VE denies. Similarly, VE attempts to minimize the significance of the materials it received from American by suggesting that the materials were not even read by certain VE lawyers involved in the representation. The billing statements submitted by VE to American, however, disclose that each of the VE lawyers in question devoted time to "review[ing] materials furnished by [the] client."

We have no reason to suggest that VE's misstatements are other than oversights, and, because they pertain only to the degree of its involvement in Project Armadillo, are secondary to the main question of the subject matter of VE's representation. Northwest contends that VE's representation of American does not warrant disqualification for two related reasons. Northwest asserts that VE was charged with a single "narrow, straightforward question" to which the answer was "obvious": Would the Justice Department oppose a complete merger of Continental and American on antitrust grounds? Northwest claims that the problem posed to VE required little detailed analysis and that all the information needed by VE to reach its conclusion "was and is publicly available." Because VE required no confidential information to determine that the merger would not be approved by the Justice Department, Northwest contends that VE's representation provides no basis for disqualification.

The record sharply contradicts Northwest's claim that all of the material supplied by American to VE was publicly available. But Northwest's argument would fail even if it could show that all of the information provided by American was a matter of public knowledge. As we explained above, the substantial relationship test, as set out in our precedents and the Rules, contains no exception for prior representations in which an attorney's advice was based on public information. Accordingly, the question is not whether VE's representation of American in Project Armadillo involved matters of public knowledge but whether the subject matter of the prior representation is substantially related to the present case.

American argues that the primary issue in Project Armadillo, as in this case, was market definition. Not only did VE represent American on this same issue, but VE was also in a position to obtain information regarding American's views on the proper measure of markets, views which Northwest's complaint suggests are relevant to the present case. Northwest recognizes that market definition will be crucial in this case, but argues that VE's treatment of this issue in Project Armadillo was superficial and limited. While conceding that "[m]ore difficult questions could have been raised had American been interested in a partial acquisition," Northwest contends that the "only issue with which American was concerned was whether it would be challenged if it attempted to acquire all of Continental's operations." According to Northwest, "[t]he answer to American's question was obvious . . . Anyone familiar with

American's hub operations in Dallas and Continental's Houston hub operations would realize that American and Continental are major competitors in this region and that their combination would be subject to challenge."

The record demonstrates, however, that the subject matter was far more complex, and VE's analysis far more extensive, than Northwest's account suggests. A VE partner's notes from the first meeting between VE and American indicate that American was interested in a partial acquisition from the very start: "AA would be interested in the entire company but there are certain operations that are particularly important . . . They would be willing to divest some operations." VE's investigation could not have "rested largely" on Continental's strong Houston presence, for when this question was brought up in the first meeting, VE noted that "AA could sell the Houston hub." Thus, sometime after the meeting a VE partner sent a memo to American explaining that he had "spoke[n] at some length" with American's economist and asked that the market share data be rerun on the assumption that American would not acquire Continental's Houston hub. While Northwest now asserts that VE's advice was based largely on the Houston hub, a VE partner at the time stated in yet another memo that even when Houston is removed from consideration, "substantial problems are created by Continental's other hubs--particularly New York City, Chicago, Cleveland, and Denver," as well as by the "substantial overlaps between Continental and American on flights to Mexico." Northwest's contention that Project Armadillo involved the single

51

question of a complete merger and required study of only a few markets is simply belied by the record.

Similarly, it does not appear that market definition and the Justice Department's opposition to the merger were as "obvious" as Northwest now asserts. Northwest argues that market definition cannot be a common issue between this matter and the present case because unlike in the present case, where market definition will be hotly disputed, the Department of Justice merger guidelines left little room for discussion. A VE lawyer's notes from the first Project Armadillo meeting, however, disclose a different picture:

> [American is] reluctant to take positions in connection with a Continental merger that might be inconsistent with the positions they are taking elsewhere. This issue came up in connection with the discussions of markets. Apparently they have developed a variety of different views about what are relevant markets. (It appears to me that maybe their argument is there are no relevant markets). Evidently the material that they will be sending us discusses relevant markets, discusses the "city pair" analysis and competition among hubs. . . . Apparently they have taken the position that hubs are not markets . . . .

In addition, Northwest contends that the Department of Justice's merger guidelines made the answer obvious. This is not the position that VE took during the representation, however. Upon receiving a memo prepared by American setting out the difficulties to merger under the city-pair analysis, a VE partner responded that the memo was "only the beginning of the analysis in my view." The VE lawyer then went on to suggest that American might be able to acquire Continental even though the merger might "violate" the guidelines.

We are forced to the conclusion that the question of market definition in Project Armadillo was more complex than Northwest now asserts. VE's representation of American necessarily required a detailed evaluation of American's operations in the various markets that might be deemed relevant. The instant case will involve similar issues.

VE was also privy to American's views of the relevant air transportation markets, a related matter that will also be at issue in the present case. American provided VE with materials reflecting AA's position on antitrust issues in prior merger/acquisition cases. Included in these materials were confidential "white papers" filed by American with the Justice Department.

In support of its claim that markets other than the national market are relevant in the present case, Northwest's complaint asserts that American "has repeatedly urged that O & D markets and regional airline passenger markets are relevant economic markets." Three of the examples cited by Northwest in support of this allegation appear to be taken from public testimony. The fourth is different: "AA argued to the Department of Justice in 1989 that city pair markets to and from O'Hare Airport constitute relevant markets." Northwest does not deny that this statement is contained in the materials obtained by VE from American during Project Armadillo. Nor does Northwest claim that this statement is a matter of public knowledge. Rather, Northwest states that it simply copied Continental's complaint in drafting its own. Since

53

Northwest's complaint did not involve any independent research by VE, the argument seems to run, the allegation cannot possibly be based on confidential information supplied by American. We would first point out that Northwest's explanation remains plausible only so long as the complaint remains the sole document involved in the case. Northwest will eventually have to address the issues, including American's alleged views on the relevant market, on its own. More importantly, the answer given by Northwest is precisely one the substantial relationship test forbids. Once a substantial relationship has been established, former counsel is precluded from attempting to prove that he did not receive confidences. See, e.g., Corrugated, 659 F.2d at 1347. Northwest's response here-- that VE might have obtained the information, but did not use it--is plainly barred by our precedents.

We appreciate Northwest's concern that an overly broad reading of "subject matter" can leave antitrust counselors with one client per industry--a result with little redemptive value. The nexus here is far more than case one and case two both presenting claims of attempted monopolization. Northwest contends that cases like Laker Airways Ltd. v. Pan American World Airways, 103 F.R.D. 22 (D.D.C 1984), preclude us from disqualifying VE. But American's showing in this case goes far beyond the same field, same party "points of contact" found insufficient in that case. See id. at 40. Rather, American has succeeded in "delineat[ing] with specificity the subject matters, issues and causes of action"

54

common to prior and present representations in the manner demanded by our precedents. <u>Duncan</u>, 646 F.2d at 1029.

VI.

We hold that VE's prior representations of American in substantially related matters require the disqualification of VE in this case. We therefore issue a writ of mandamus directing the district court to vacate its order denying American's motion and enter an order disqualifying VE from representing Northwest.