**James E. CRAMER Plaintiff,**

v.

**SABINE TRANSPORTATION COMPANY et al. Defendants.**

**No. CIV. A. G–00–116.**

United States District Court, S.D. Texas, Galveston Division.

May 4, 2001.

J. Mac Morgan, Law Office of J. Mac Morgan, New Orleans, LA, for James E. Cramer, plaintiffs.

James T. Brown, Legge Farrow Kimmitt and McGrath, Houston, TX, for Sabine Transportation Company, S/S Fairbanks Trading Incorporated, defendants.

### ORDER DENYING PLAINTIFF'S MOTION TO DISQUALIFY AN ATTORNEY AND DENYING PLAINTIFF'S MOTION IN LIMINE

KENT, District Judge.

This is a maritime personal injury case, presently set for a bench trial in August 2001. Now before the Court is Plaintiff's Motion to Disqualify an Attorney and Plaintiff's Motion in Limine. For the reasons stated below, both Motions are DENIED.

## I.  BACKGROUND

On August 19, 1999, thirteen hours after departing Galveston, Texas, Plaintiff was working as a seaman aboard the S/S FAIRBANKS steaming in the Gulf of Mexico. While returning to his quarters following a routine shipboard drill, Plaintiff alleges that he snared part of his gear on the handrail of an interior stairwell. This incident allegedly caused Plaintiff's wrist to bang against a hard surface in the stairwell, producing internal injuries. Plaintiff thereafter filed suit in this Court, on February 29, 2000, asserting causes of action for negligence and for the unseaworthiness of the vessel.

Plaintiff's theory of liability in this case, or at least part thereof, hinges upon the unsafe condition of the vessel's stairwell, which allegedly caused Plaintiff's injury. Accordingly, on June 7, 2000, Plaintiff retained an expert, Captain John McNeilly ("the Captain" or "Captain McNeilly"), to testify regarding the stairwell and, presumably, its shortcomings. Captain McNeilly, unlike many experts utilized in countless similar proceedings before this Court, is not a retired seafarer. Instead, Captain McNeilly presently serves as the Chief Officer of the M/V CAPE KENNEDY, a ship berthed in New Orleans and forming part of the United States Maritime Administration's Ready Reserve Fleet. The CAPE KENNEDY is operated by Keystone Shipping Company, which also employs Captain McNeilly.

Some months then passed before the *ex parte* encounter of which Plaintiff com-

plains. On October 27, 2000, Jerry McKenney[1] ("McKenney") boarded the CAPE KENNEDY in order to photograph her interior stairwells as exemplars to be utilized in the present case. McKenney gained access to the CAPE KENNEDY based upon his law firm's legal representation of Keystone Shipping Company. The stage thus set; the action unfolds.

According to the affidavit submitted by Captain McNeilly, he introduced himself to McKenney, who indicated that he knew of the Captain.[2] McKenney also informed Captain McNeilly, upon query, that this inspection was related to the present lawsuit. Captain McNeilly then proceeded to show McKenney the CAPE KENNEDY's three interior stairwells. Captain McNeilly testifies that he and McKenney discussed the "similarities and differences between the interior stairwells of both ships."[3] The pair also allegedly conversed about "federal regulations which had been identified in an expert report prepared for [Defendant] Sabine."

McKenney vigorously disputes Captain McNeilly's version of the facts by his own affidavit. According to McKenney, the two merely exchanged greetings, after which Captain McNeilly escorted him to a stairwell, before departing to return to his ship's work. McKenney states that: "[W]e did not discuss any aspect of the Cramer case. We did not discuss regula-

tions." McKenney also denies discussing the similarities and differences between the FAIRBANKS and the CAPE KENNEDY.

Again several months passed, until on January 6, 2001, Captain McNeilly and McKenney became reacquainted. This second meeting occurred aboard the FAIRBANKS, where Captain McNeilly was inspecting and photographing her interior stairwells. The Plaintiff's attorney, Morgan, was also present at this meeting, and Captain McNeilly there informed Morgan that McKenney was the individual who had previously boarded the CAPE KENNEDY. Captain Morgan now maintains that he was unaware throughout their discourse aboard the CAPE KENNEDY that McKenney was an attorney for the Defendants, and instead operated under the mistaken assumption that McKenney was Defendants' rival expert.[4]

Plaintiff now complains that McKenney's alleged substantive conversations with Captain McNeilly constitute prohibited *ex parte* communications for which McKenney individually, but not Legge Farrow as a firm, should be disqualified.

## II. ANALYSIS

### A. *Motion to Disqualify*

■ Motions to disqualify attorneys are substantive motions determined by stan-

---

1. McKenney works as an associate with the Houston, Texas law firm of Legge, Farrow, Kimmitt, McGrath and Brown ("Legge Farrow"). McKenney assists the attorney-in-charge for Defendants, James T. Brown, a partner in Legge Farrow.

2. On August 11, 2000, Captain McNeilly issued his preliminary expert report to Plaintiff's counsel of record, J. Mac Morgan ("Morgan"). Captain McNeilly also provided Morgan with a copy of his current resume, which set forth that he served aboard the CAPE KENNEDY. Several days later, Mor-

gan forwarded both the report and the resume to McKenney.

3. Having already produced his initial expert report, Captain McNeilly had reviewed photographs of the FAIRBANKS.

4. At some later time, however, Captain McNeilly was provided with an e-mail message from his employer that did identify McKenney as an attorney. Neither party provides any indication of when precisely the Captain received the e-mail.

dards developed under federal law. *See In re Dresser Indus., Inc.,* 972 F.2d 540, 543 (5th Cir.1992). Such motions are governed by the ethical rules announced by the state and national professions in light of the public interest and rights of the litigants. *See id.; In re American Airlines, Inc.,* 972 F.2d 605, 610 (5th Cir. 1992). Accordingly, the ABA Model Rules of Professional Conduct ("Model Rules"), the ABA Model Code of Professional Conduct ("Model Code"), the Texas Rules of Professional Conduct ("Texas Rules"), and the Local Rules of this Court are all relevant to the Court's resolution of the Motion to Disqualify. *See American Airlines,* 972 F.2d at 610; *accord F.D .I.C. v. United States Fire Ins. Co.,* 50 F.3d 1304, 1311–12 (5th Cir.1995). In the Southern District of Texas, the Texas Rules provide the standard of conduct for attorneys, thereby eliminating the need to refer to a distinct set of local rules. *See* S.D. Tex. Local Rule 83.1(L), Appendix A Rule 1(A). Furthermore, as the ABA adopted the Model Rules in 1983 as a replacement for the Model Code, the Model Code arguably no longer represents the ethical rules of the national profession. *See F.D.I.C.,* 50 F.3d at 1309 n. 4. Accordingly, this Court will look principally to the Model Rules and the Texas Rules in addressing the question of disqualification.

▮▮▮ In the Fifth Circuit, courts are obliged to stem unethical conduct taking place in any proceeding before them. *See American Airlines,* 972 F.2d at 611. Therefore, a party may appropriately utilize a motion to disqualify to inform the Court of a breach of ethical duties. *See id.* However, the party seeking to disqualify an attorney must thereafter bear the burden of proving that disqualification is warranted. *See Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 646 F.2d 1020, 1028 (5th Cir. Unit B June 1, 1981).

Plaintiff moves to disqualify Defendants' counsel McKenney based upon the above outlined *ex parte* contacts with Plaintiff's expert witness. According to Plaintiff, two separate legal bases support the urged disqualification. First, McKenney's conduct is said to violate Texas Rule 4.02, "Communication with One Represented by Counsel." Second, McKenney's actions allegedly violate the provisions of Model Rule 3.4, "Fairness to Opposing Party and Counsel."

## B. *The Applicable Legal Standards*

### 1. *The Texas Rules*

Texas Rule 4.02(b) "Communication with One Represented by Counsel" provides:

> In representing a client a lawyer shall not communicate or cause another to communicate about the subject of representation with a person or organization a lawyer knows to be employed or retained for the purpose of conferring with or advising another lawyer about the subject of the representation, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

Comment 3 clarifies that experts indeed fall within the ambit of this rule.[5] *See* Texas Rule 4.02(b) cmt. 3 ("[T]his Rule provides that unless authorized by law, experts employed or retained by a lawyer for a particular matter should not be contacted by opposing counsel regarding the matter without the consent of the lawyer who retained them.").

---

5. The Model Rules do contain an analog to Texas Rule 4.02 concerning the communication with one represented by counsel. *See* Model Rule 4.2. However, the analog does not address communication with experts as seen in Texas Rule 4.02(b).

## 2. *The Model Rules*

The Model Rules do not expressly prohibit *ex parte* contacts with a retained expert. However, an ABA ethics opinion has discussed this issue and explains how such conduct may nonetheless violate the Model Rules. *See* ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 93–378 (1993) (hereinafter "ABA Opinion 93–378"). According to the ABA Opinion, for cases pending in federal court, "a lawyer who engages in [*ex parte* contact with an expert] may violate Model Rule 3.4(c)." *Id.* This Rule provides that "[a] lawyer shall not ... knowingly disobey an obligation under the rules of a tribunal." Model Rule 3.4(b). Accordingly, the failure to comply with the discovery rules applicable in this Court can be viewed as a violation of Model Rule 3.4. *See* ABA Opinion 93–378.

Among the federal discovery rules is Federal Rule of Civil Procedure 26(b)(4)(A). The current version of this Rule provides that: "A party may depose any person who has been identified as an expert whose opinions may be presented at trial." Fed.R.Civ.P. 26(b)(4)(A). Several courts have interpreted a previous version of this rule as establishing the exclusive means by which expert discovery may occur.[6] *See, e.g., Erickson v. Newmar Corp.*, 87 F.3d 298, 301–302 (9th Cir.1996). Therefore, reason these courts, Rule 26 implicitly prohibits *ex parte* communications with experts. *See, e.g., Erickson*, 87 F.3d at 302. As noted, however, a more literally restrictive Rule 26(b)(4)(A) was formerly in place. *See* Discussion Note 6. Neither party has addressed the impact of the intervening changes in Rule 26(b)(4). However, because the Texas Rules prohibit *ex parte* contacts with retained experts,

the Court need not consider the present vitality of the ABA's analysis.

## C. *Whether to Disqualify?*

■ Federal courts possess "an arsenal of sanctions" that can be imposed for an attorney's unethical behavior. *Erickson*, 87 F.3d at 303. Specifically, a court may order an attorney's disqualification for a violation of the expert *ex parte* contact rules. *See id.* However, the Court notes that while it never takes lightly allegations of misconduct by a lawyer, it will neither disqualify nor otherwise chasten a member of the Court's bar without being satisfied that a violation took place and that the violation rises to a level requiring action. *See Ayus v. Total Renal Care, Inc.*, 48 F.Supp.2d 714, 719 (S.D.Tex.1999).

■ It is undisputed that McKenney and Captain McNeilly spoke aboard the CAPE KENNEDY, and that whatever conversation transpired took place without Plaintiff's counsel's permission. The parties disagree, however, on whether Captain McNeilly and McKenney "communicate[d] about the subject of representation." Texas Rule 4 .02(b). The parties have indeed presented the Court with two diametrically opposed versions of the encounter between McKenney and Captain McNeilly. The Court finds itself, however, inclined toward the version of facts urged by Defendants, for the simple reason that they make more sense.

As Defendants point out, Plaintiff complained about the alleged *ex parte* conversation only upon learning that McKenney was actually an attorney, rather than a mere expert retained by Defendants' attorneys. Thus, according to Defendants, if Captain McNeilly was *ex parted*, the

---

**6.** The former rule provided that interrogatories, and with leave of court, depositions were the " 'only' " means of obtaining discovery from experts. *See* Erickson, 87 F.3d at 301 (quoting former Fed.R.Civ.P. 24(b)(4)).

concerns supporting any sort of sanction were manifest months before Plaintiff complained.[7] Thus, Plaintiff's initial non-concern over this communication until learning that McKenney, rather than a representative of McKenney, was involved, strongly suggests that the Captain conveyed no information of import. Indeed, Plaintiff does not allege that any confidential information, or any specific information at all beyond vague generalities, was in fact shared. This significantly undermines Plaintiff's request for disqualification. *See Tidemann v. Nadler Golf Car Sales, Inc.*, 224 F.3d 719, 724 (7th Cir. 2000) (stating that the protecting of confidential information is one justification for the rule prohibiting *ex parte* contact with experts).

Moreover, the unseaworthiness of a stairwell is hardly a complicated issue. And to the extent the Captain holds creative opinions regarding the stairwell at issue, the information would necessarily come out through the production of the Captain's expert report and via the depositions that Defendants in all likelihood will undertake to establish the full basis for his testimony. Therefore, the notion that McKenney would risk improper contact, and thus sanctions and discipline, in order to hold a needless discussion with Captain McNeilly simply seems extraordinary. Moreover, because all this information would ultimately be revealed through re-

ports and depositions, the harm to Plaintiff is seemingly minimal.

However, even assuming *arguendo*, that Captain McNeilly explained his entire theory of unseaworthiness to Plaintiff's counsel, along with various confidences, this alone would still not necessarily justify disqualification. The Court also considers McKenney's culpability.[8] *See Faison v. Thornton*, 863 F.Supp. 1204, 1214 (D.Nev. 1993) ("The flagrancy and mental state accompanying an ethical violation ... affect the possible sanction."). Unlike other cases supporting sanctions, there is no evidence of significant fault by an attorney. This is not a scenario in which an attorney intentionally contacted an expert in order to manipulate testimony. *See Erickson*, 87 F.3d at 301 (remanding a case for sanctions and a new trial because the defense attorney offered a monetary inducement, engagement in another case, to an opposing expert prior to trial). Nor is this a situation in which an attorney sought to have a plaintiff's expert change allegiance and testify for the defendant. *See Campbell Indus. v. M/V Gemini*, 619 F.2d 24, 26 (9th Cir.1980) (affirming striking of expert who "switched sides" following *ex parte* contacts). Plaintiff provides no evidence that McKenney initiated the meeting with Captain McNeilly or encouraged the Captain to either begin or continue disgorging

---

7. Texas Rule 4.02(b) prohibits an attorney from causing another to communicate with a retained expert. Thus, if the Captain disclosed worrisome information to anyone associated with Defendants, regardless of title, Plaintiff would have been well advised to investigate whether Texas Rule 4.02 had been violated.

8. The ABA Opinion uses the words "initiates," "makes," and "engages" as the active verb for the lawyer's role in the *ex parte* conduct. ABA Formal Opinion 93–378. Depending upon which is the operative word,

each suggests that a progressively lesser level of culpability may lead to a violation. *See id.* Similarly, the Comment to the Texas Rules state that an expert "should not be contacted by opposing counsel." *See* Texas Rule 4.02, Cmt 3. These verbs suggest that some active conduct by the offending lawyer may be required to trigger a rules violation. The Court, however, assumes for this discussion that an attorney need not take an active role. *Cf. Faison*, 863 F.Supp. at 1214 (finding negligence or mistake sufficient).

information following their happenstance encounter.

In addition, the Court notes that Captain McNeilly, himself, should have known better than to share information with any person connected to the adversary. *See* Steven Lubet, *Expert Witnesses: Ethics and Professionalism,* 12 Geo. J. Legal Ethics 465, 473 (1999) ("Most experts would consider it unprofessional, at the very least, to hold ex parte discussions with opposing counsel in the absence of notice to the retaining lawyer."). Indeed, the ABA recommends that an attorney, in a letter retaining an expert, should clarify the expert's obligations of confidentiality. *See* ABA Comm. On Ethics and Prof'l Responsibility, Formal Op. 97–407 (1997). Moreover, Plaintiff made the decision to engage an active Captain, knowing that defense attorneys routinely conduct these types of ship board inspections. In fact, this is how young associates get their feet wet and learn about merchant ships. Therefore, to the extent that Plaintiff has suffered any harm, however negligible, it is largely self-inflicted.

In sum, the Court is not persuaded after reviewing Plaintiff's allegations that an *ex parte* conversation regarding the subject of this lawsuit took place. However, even assuming that a discussion occurred, the Court finds no basis for imposing a disqualification sanction. Having said this, the Court nonetheless suggests that Defendants may be well served to substitute a different associate to work on this file. This is, however, mere advice, which may help the parties proceed amicably toward a resolution of this matter, as well as further sanitize the matter for possible appellate scrutiny. In this Court's view, counsel has been vindicated. Plaintiff has failed to carry its burden of demonstrating a need for disqualification. Defendants may choose how to proceed from here.

Despite rejecting Plaintiff's request for disqualification, the Court notes that Defendants have made one concession regarding McKenney's continuing role in this matter. Defendants agree not to cross-examine the Captain regarding the alleged conversations. This restriction is so **ORDERED.**

**B.** *Motion in Limine*

Plaintiff has also filed a Motion in Limine contending that Defendants should be prohibited from offering evidence of Plaintiff's wage loss that allegedly does not comport with the requirements of *Culver II. See Culver v. Slater Boat Co.,* 722 F.2d 114 (5th Cir.1983). This Motion is **DENIED.**

■ First, this is a bench trial, making any motion in limine asinine on its face. Motions in limine are intended to prevent allegedly prejudicial evidence from being so much as whispered before a jury prior to obtaining the Court's permission to broach the topic. In a bench trial, such procedures are unnecessary, as the Court can and does readily exclude from its consideration inappropriate evidence of whatever ilk. Moreover, this Court has applied the doctrine of *Culver II* literally thousands of times, and thus can readily and properly calculate wage loss, if any, without being forced to consider *pro forma* pre-trial motions such as this.

## III. CONCLUSION

Plaintiff, in his Motion to Disqualify, attempts to assure the Court that the Motion has not been interposed for any improper purpose. The Court takes Plaintiff at his word. Nonetheless, the Court cannot help but conclude that both of Plaintiff's Motions are, at best, silly and, therefore, quite wasteful of not only this Court's time but the time of all parties involved in

this dispute. In the future, Plaintiff would be well advised to practice what he preaches and not interject such immoderate Motions into proceedings before this Court. In sum, as each lacks merit, Plaintiff's Motion to Disqualify and Motion in Limine are **DENIED.**

**IT IS SO ORDERED.**