Jacquelin GROSSER–SAMUELS, Plaintiff/Counter–Defendant,

v.

JACQUELIN DESIGNS ENTERPRISES, INC., Defendant/Counter–Plaintiff,

and

Du Nouveau Designs, Inc., Third–Party Plaintiff,

v.

Michael Burns, Third–Party Defendant.

No. 4:06–CV–159–A.

United States District Court, N.D. Texas, Fort Worth Division.

Sept. 13, 2006.

George R. Schultz, Schultz & Associates, Dallas, TX, for Plaintiff/Counter–Defendant and Third–Party Defendant.

William D. Harris, Jr., Schultz & Associates, Dallas, TX, for Plaintiff/Counter–Defendant.

John C. Eichman, Marc D. Katz, Peggy Facklis, Jenkens & Gilchrist, Dallas, TX, for Defendant/Counter–Plaintiff and Third–Party Plaintiff.

*MEMORANDUM OPINION*
and *ORDER*

MCBRYDE, District Judge.

Before the court for decision is the motion of defendant and counter-plaintiff,

Jacquelin Designs Enterprises, Inc., ("JDE"), and third-party plaintiff, duNouveau Designs, Inc., ("duNouveau"), to disqualify George R. "Russ" Schultz ("Schultz") and his firm, Schultz & Associates, P.C., ("Schultz Firm") as counsel for plaintiff and counter-defendant, Jacquelin Grosser–Samuels, ("Grosser–Samuels") and third-party defendant, Michael Burns, ("Burns"), and to impose sanctions against those attorneys. The court has concluded that the motion to disqualify should be granted as to Schultz and the other attorneys with his firm, and that the request for sanctions should be held in abeyance.

## I.

### Grounds of the Motion

The issue of disqualification was first raised by an emergency motion filed by JDE and duNouveau on March 21, 2006, to stay proceedings pending discovery and ruling on disqualification issues. That motion was briefly considered at the hearing conducted on March 21, which primarily was related to a motion for preliminary injunction. The formal motion was filed March 29, 2006. It was prompted by the recent discovery by counsel for JDE and duNouveau in the records of JDE of evidence that Schultz and his firm had served, and were serving, as attorneys for JDE.

JDE's records contained (1) a document titled "Revocation and Substitute Power of Attorney" executed by JDE, acting through Grosser–Samuels as its president,[1] in December 2005, appointing Schultz and his firm "to transact all business in the United States Patent and Trademark Office" in connection with a trademark held by JDE, and designating Schultz as JDE's "attorney with full power of substitution and revocation, to transact all business connected with [the trademark]," Mot. to Disqualify, App. at 30–31, and (2) a letter from Schultz, bearing the letterhead of Schultz & Associates, P.C., to the Commissioner of Trademarks dated December 19, 2005, transmitting the Revocation and Substitute Power of Attorney together with three other similar documents.[2]

The records also included invoices directed to JDE by its business consultant, Kent Mansfield ("Mansfield") (who does business as Tara Business Consulting), indicating that payments were made during the year 2005 by JDE to the consulting firm for time Mansfield devoted to conferences with Schultz relative to the affairs of JDE, and for time devoted by the firm to the preparation of checks payable to Schultz and the delivery of one of the checks. Mot. to Disqualify, App. at 18, 21, 25.

JDE and duNouveau maintain in their motion that Schultz and his firm were attorneys for JDE when Schultz filed this action in February 2006 for Grosser–Samuels, and that they should be ordered disqualified because by filing this action against JDE they violated rules of professional conduct that prohibit a lawyer from representing a client if the representation of that client will be adverse to another client and because their representation of Grosser–Samuels and Burns against JDE in this action involves a matter substantially related to the work Schultz and his firm previously performed for JDE.

---

1. Grosser–Samuels was president of JDE until February 2006. Tr. of Mar. 21, 2006, hr'g at 34.

2. The record shows that on March 29, 2006, eight days after the request for disqualification was first presented to the court, Schultz submitted to the Commissioner of Trademarks a document titled "Withdrawal of Attorney" in which he said that the Revocation and Substitute Power of Attorney was being withdrawn for the reason that "[r]epresentation is likely to result in a conflict of interest." Resp.App. at 107–108.

As another ground for disqualifying Schultz, JDE and duNouveau expressed serious concerns that Schultz assisted Grosser–Samuels in carrying out the conduct of which the counterclaims of JDE and duNouveau complain, pointing out that Schultz might well be called to testify as a witness and that there is a possibility that he will become a party to the litigation.

The request for sanctions feature of the motion is based on statements Schultz made to the court during a hearing conducted March 21, 2006, on a motion of JDE and duNouveau asking for injunctive relief, and deposition testimony Schultz gave on that same date, that JDE and duNouveau interpret to be unqualified representations by Schultz that he never served as an attorney for JDE. JDE and duNouveau maintain that by giving false testimony concerning his representation of JDE, and by persisting in his representation of Grosser–Samuels and Burns, Schultz has caused JDE and duNouveau to expend unnecessary cost "in resolving this issue that could easily have been avoided if Mr. Schultz had acknowledged his attorney-client relationship with JDE at the [March 21] hearing." Mot. to Disqualify at 7–8. The movants add that, in addition, the court has "the inherent authority to enter an award of sanctions against the Schultz Firm for its conduct in the handling of this matter." Id. at 8.

## II.

### Nature of the Litigation

#### A. The Complaint.

Grosser–Samuels instituted this action through Schultz as her attorney on February 27, 2006, by a complaint naming JDE as the defendant. The alleged facts on which she bases her claims are as follows:

Patent No. 6,484,535 B2 pertaining to an adjustable jewelry assembly was issued to Grosser–Samuels on November 26, 2002. On March 20, 2005, Grosser–Samuels granted a license to Pacific Crown Holdings ("PCH") to make, use, and sell goods covered by the patent and to grant sublicenses under the patent. On or about July 1, 2005, PCH granted a license under the patent to JDE (the "JDE license") to sell merchandise in the wholesale jewelry industry that was covered by the claims of the patent. In the JDE license, JDE agreed not to sell or distribute any goods that were covered by the claims of the patent after termination of the license. JDE's rights under the JDE license terminated on February 26, 2005. Notwithstanding termination of the JDE license, JDE has continued to sell and distribute goods that infringe the patent, and has contracted to deliver the infringing goods through July 2006.

Based on those facts, Grosser–Samuels alleges that JDE, with full knowledge of the patent, is willfully and intentionally infringing the patent, and is actively inducing others to infringe it, and that the infringement started as early as March 1, 2006. Grosser–Samuels requests as relief (a) the grant of a preliminary, and then permanent, injunction restraining defendant from infringing, and inducing others to infringe, the patent, (b) a judgment against JDE for patent infringement damages, trebled, and (c) recovery from JDE of reasonable attorney's fees and costs of court.

#### B. The Counterclaim.

On March 8, 2006, JDE filed its original answer and counterclaim. It joined duNouveau as a third-party plaintiff and named Burns as a third-party defendant. By the counterclaim, JDE and duNouveau seek injunctive relief against Grosser–Samuels and Burns, a judgment awarding JDE and duNouveau damages against Grosser–Samuels and Burns caused by the allegedly improper conduct described in

the counterclaim, and an order directing that Patent No. 6,484,535 B2 be assigned to JDE. The facts alleged by JDE and duNouveau on which their counterclaim against Grosser–Samuels and Burns is based are, in summary, as follows:

1. On November 26, 1997, Grosser–Samuels, The Baguette Source, Inc. ("BEI"), and Jacquelin Enterprises, Inc. ("JEI"), on the one hand, and JGS, Inc., on the other, entered into an agreement whereby JGS, Inc., acquired certain assets of Grosser–Samuels, BEI, and JEI. On February 23, 1998, JGS, Inc. sold to duNouveau all of JGS, Inc.'s assets. On April 18, 1998, Grosser–Samuels entered into an employment agreement with duNouveau effective March 1, 1998, pursuant to which she became duNouveau's Chief Creative Officer and Head Designer for a period of three years. During the course of her employment by duNouveau, Grosser–Samuels also served as president and director of duNouveau. On December 1, 1998, Grosser–Samuels resigned from her positions with duNouveau; and, effective that same date, she entered into an employment agreement with JDE pursuant to which she was retained as Designer of Jewelry on an exclusive basis for JDE's international jewelry business for a period of twenty-four months. During Grosser–Samuels' employment with JDE, she also served as president and director of JDE. In an addendum to her employment agreement with JDE, Grosser–Samuels acknowledged that in November 1998, while employed by duNouveau, she designed "certain mechanics" attached to jewelry for which she intended to seek a patent if the design was successful. Answer & Counterclaim at 7, ¶ 9

2. Grosser–Samuels' duties as Designer of Jewelry for JDE included developing (1) new jewelry designs under the "Jacquelin" name, (2) marketing those designs in conjunction with JDE's jewelry business, and (3) developing business relationships on behalf of JDE based upon those designs. A provision in the employment agreement between JDE and Grosser–Samuels provided that the design by Grosser–Samuels "under the employ of JDE is proprietary to JDE which is to launch the products/collections to luxury retail points of sale." *Id.* at ¶ 11. Another provision provided that "[a]ll designs and the work product relating to and leading to such designs, created by [Grosser–Samuels] during the term [of the agreement], shall become and shall remain Intellectual Property owned by JDE." *Id.* at ¶ 12.

3. While her employment agreement with JDE was in force, Grosser–Samuels did the following:

(a) On February 24, 1999, she caused a patent application for an adjustable necklace clasp to be filed with the U.S. Patent and Trademark Office, which was issued as patent number 6,202,443 B1 on March 20, 2001.

(b) On April 28, 1999, she caused a patent application for a jewelry display device to be filed with the U.S. Patent and Trademark Office, which was issued as patent number 6,205,688 B1 on March 27, 2001.

(c) On January 16, 2001, she caused a patent application for a continuation of the adjustable necklace to be filed with the U.S. Patent and Trademark Office, which was issued as patent number 6,484,535 B2 on November 26, 2002.

4. After filing those patents, Grosser–Samuels sold them to PCH, which is a fictitious corporation owned and operated by Grosser–Samuels' parents. On March 21, 2005, and again on July 1, 2005, PCH and Grosser–Samuels, purporting to act as president of JDE, executed a revocable license and royalty agreement whereby PCH, in exchange for a licensing fee, agreed to permit JDE to produce, pur-

chase, and resell certain component parts of mechanisms associated with the patents. On December 28, 2005, PCH notified JDE by letter of PCH's intent to revoke their license and royalty agreement effective sixty days thereafter.

5. On February 3, 2006, Grosser–Samuels resigned from her positions at JDE and duNouveau.[3] PCH sent a letter to JDE on February 17, 2006, admonishing JDE for attempting to purchase one of Grosser–Samuels' designs from a PCH supplier, and threatening the initiation of a patent infringement lawsuit.

6. Upon leaving JDE, Grosser–Samuels removed, without authorization, all company files from her office, including confidential and proprietary information; and, Grosser–Samuels has attempted to use the information she obtained and other confidential information of JDE to set up a business in competition with JDE. Grosser–Samuels had been planning since as early as 2001 to set up such a competing business using JDE's confidential and proprietary information at a time when she was acting as President and Director of JDE.

7. Since Grosser–Samuels' departure from JDE, JDE has received a communication from one of its suppliers that the supplier no longer can supply JDE with certain jewelry components due to restrictions placed upon the supplier by PCH; and, certain of JDE's clients have expressed doubt to JDE's personnel about JDE's ability and legal right to market and distribute products that were developed during Grosser–Samuels' employment. And, since her termination from JDE, Grosser–Samuels has used confidential and proprietary information of JDE and duNouveau, including information about their models, jewelry designs, market strategy, vendor and customer information, and pricing information, to develop and market identical products to customers of JDE and duNouveau at reduced prices.

8. While employed with duNouveau and JDE, Grosser–Samuels committed substantial waste of company resources through the hiring of her friends and family, paying for the rent and other personal expenses for her boyfriend and herself, taking personal trips at the expense of JDE and duNouveau, and purchasing personal goods and services for those people with the funds of JDE and duNouveau. Grosser–Samuels' boyfriend, Burns, was hired by Grosser–Samuels as JDE's Director of Information Technology, having the responsibility for setting up and establishing JDE's corporate websites. At about the time of Grosser–Samuels' resignation from JDE, Burns blocked JDE's access to its corporate websites, and has since refused to provide JDE management with appropriate access codes, with the result that JDE has been unable to access its own corporate websites.

JDE and duNouveau assert in the counterclaim causes of action against Grosser–Samuels or Grosser–Samuels and Burns for conversion, tortious interference with business relationships, defamation, breach of contract, breach of fiduciary duty of loyalty, misappropriation, unjust enrichment, and violation of the Texas Theft Liability Act.

---

**3.** The allegations of the counterclaim do not give an explanation of the facts that led to Grosser–Samuels serving as an officer and employee of JDE and duNouveau in February 2006. Rather, as noted in the text, the allegations suggest that Grosser–Samuels no longer was an officer, employee, and director of duNouveau after December 1, 1998, and that her employment with JDE was to be for a two-year term commencing December 1, 1998.

The allegations of the conversion claim are that by obtaining patents and trademarks on designs formulated by Grosser–Samuels during the course of her employment with JDE and duNouveau, and by utilizing confidential and proprietary customer information and good will obtained during that employment to obtain a competitive advantage, Grosser–Samuels committed unlawful conversion. The claim of tortious interference with business relationships is based on a theory that Grosser–Samuels tortiously interfered with the business relations and prospective business relations of JDE and duNouveau by providing false information to Grosser–Samuels' suppliers, customers, and potential customers regarding the ability and legal right of JDE and duNouveau to conduct their businesses, and by using confidential and proprietary information to conduct Grosser–Samuels' own business. The defamation claim is based on alleged false statements Grosser–Samuels has made to suppliers and customers of JDE and duNouveau. The allegations of the breach of contract claim are that Grosser–Samuels breached her agreement with JDE by obtaining patents and trademarks on jewelry designs developed and marketed by her during the course of her employment with JDE. The allegations of the breach of fiduciary duty of loyalty claim are that Grosser–Samuels owed a fiduciary duty of loyalty to JDE and duNouveau to act solely in their benefit in all matters connected with her employment, and to do no act tending to injure their business or financial interests. The misappropriation claim asserts that by using information Grosser–Samuels and Burns acquired during their employment relationships with JDE they have misappropriated confidential and proprietary information of JDE and duNouveau to their damage. The allegations of the unjust enrichment claim are that Grosser–Samuels has unjustly enriched herself by accepting monies in conjunction with intellectual property owned by JDE and duNouveau.

### C. Response to the Counterclaim.

The response of Grosser–Samuels and Burns to the counterclaim was filed on their behalf by Schultz as their attorney.

## III.

### Standards to be Applied in Determining Whether Conflict Disqualification is Required

■ This court is obligated to take measures against any unethical conduct occurring in connection with this action. See Musicus v. Westinghouse Elec. Corp., 621 F.2d 742, 744 (5th Cir.1980). See also In re American Airlines, Inc., 972 F.2d 605, 611 (5th Cir.1992). A motion to disqualify counsel, such as the one now before the court, "is the proper method for a party-litigant to bring the issues of conflict of interest or breach of ethical duties to the attention of the court." Musicus, 621 F.2d at 744. The Fifth Circuit has elected "to remain 'sensitive to preventing conflicts of interest,'" American Airlines, 972 F.2d at 611. In American Airlines, the Fifth Circuit, as it had done in the past, rigorously applied the relevant ethical standards in reviewing the disqualification motion. Id.

In answer to the question of "whether a law firm may sue its own client, which it concurrently represents in other matters," the Fifth Circuit said in In re Dresser Indus., Inc. "[i]n a word, no." 972 F.2d 540, 541 (5th Cir.1992). "Neither the ABA Model Rules of Professional Conduct nor the Code of Professional Responsibility allows an attorney to bring a suit against a client without its consent." Id. at 544 (footnotes omitted).

There can be exceptional circumstances where a clear impropriety will not deter-

mine the outcome of a motion to recuse based on a conflict of representation. *Id.* at 545. An attorney might be able to engage in dual representation if he can show "some social interest to be served by his representation that would outweigh the public perception of his impropriety." *Id.* If there is no suggestion in the record that another lawyer could not ably perform the representation at issue or that there is a societal or professional interest to be served by continuing the representation, concurrent representation should lead to disqualification. *Id.*

■ When a former client moves to disqualify an attorney who appears on behalf of its adversary, the law of the Fifth Circuit is "fairly straightforward" that the movant "need only to show that the matters embraced within the pending suit are *substantially related* to the matters or cause of action wherein the attorney previously represented [it]." *Wilson P. Abraham Constr. Corp. v. Armco Steel Corp.,* 559 F.2d 250, 252 (5th Cir.1977). As the Fifth Circuit explained in *Abraham*:

> This rule rests upon the presumption that confidences potentially damaging to the client have been disclosed to the attorney during the former period of representation. The Court may not even inquire as to whether such disclosures were in fact made or whether the attorney in fact is likely to use the damaging disclosures to the detriment of his former client. The inquiry is limited solely to whether the matters of the present suit are substantially related to matters of the prior representation, and this is because this Court recognizes that in order to aid the frank exchange between attorney and client, it is necessary to preclude even a possibility that information given in confidence by a former client will ever be used without that client's consent.

*Id.* (citation omitted). The presumption to which the Fifth Circuit referred in *Abraham* is irrebuttable. *American Airlines,* 972 F.2d at 614 (saying that "[o]nce it is established that the prior matters are substantially related to the present case, the court will irrebuttably presume that relevant confidential information was disclosed during the former period of representation" (internal quotation marks omitted)). There is a second irrebuttable presumption that confidences presumably obtained by an individual lawyer will be shared with the other members of his firm. *Id.* at 614 n. 1.

■ The party seeking disqualification has the burden to prove that the present and prior representations are substantially related. *Id.* Once the movant establishes a substantial relationship between the past and current representations, disqualification is required, but "a substantial relationship may be found only after the moving party delineates with specificity the subject matters, issues and causes of action common to prior and current representations and the court engages in a painstaking analysis of the facts and precise application of precedent." *Id.* (internal quotation marks omitted). Two concerns underlie the substantial-relationship test: "the duty to preserve confidences and the duty of loyalty to a former client." *Id.* at 618 (internal quotation marks omitted). The duty of loyalty to the client is one of the basic tenants of the legal profession. *Douglas v. DynMcDermott Petroleum Operations Co.,* 144 F.3d 364, 370 (5th Cir.1998). "The purpose of ethical precepts is to preserve public confidence in the bar and in the legal process." *Id.* (internal quotation marks & brackets omitted).

■ The rule expressed in *Abraham*, and repeated in later cases, is a reinforcement of the applicable rules governing the

professional conduct of attorneys. 559 F.2d at 252. More generally, "[m]otions to disqualify are substantive motions affecting the rights of the parties and are determined by applying standards developed under federal law." *Dresser*, 972 F.2d at 543. Generally speaking, a motion to disqualify is "governed by the ethical rules announced by the national profession in the light of the public interest and the litigants' rights." *Id.* The Fifth Circuit's "source for the standards of the profession has been the canons of ethics developed by the American Bar Association." *Id.* Ethical standards of the forum state are to be taken into account as well. *See Horaist v. Doctor's Hosp. of Opelousas*, 255 F.3d 261, 266 (5th Cir.2001); *E.E.O.C. v. Exxon Corp.*, 202 F.3d 755, 759 (5th Cir.2000); *Cramer v. Sabine Transp. Co.*, 141 F.Supp.2d 727, 730 (S.D.Tex.2001).

■ Included in the ABA standards is the admonition that "lawyers should avoid 'even the appearance of impropriety.' " [4] *Dresser*, 972 F.2d at 543 (citing *Brennan's, Inc. v. Brennan's Restaurants, Inc.*, 590 F.2d 168, 171 (5th Cir.1979)). However, the appearance-of-impropriety standard should be applied with caution. *Woods v. Covington County Bank*, 537 F.2d 804, 813 (5th Cir.1976). For disqualification to be based on a violation of that standard of conduct, "there must be at least a reasonable possibility that some specifically identifiable impropriety did in fact occur." *Id.* Disqualification is not always required

"even where there is a reasonable possibility of improper professional conduct." *Id.* at 813 n. 12. The court "must also find that the likelihood of public suspicion or obloquy outweighs the social interest which will be served by a lawyer's continued participation in a particular case." *Id.* See *also Horaist*, 255 F.3d at 266.

## IV.

### *Disqualification of Schultz is Appropriate Under the Fifth Circuit's Conflict Standards*

In reaching decisions as to the difficult issues presented by the motion to disqualify, the court has made a painstaking evaluation of the pleadings; the motion and response, reply, and supplements; the contents of all appendices; and, the record of the hearing held March 21, 2006, at which JDE and duNouveau first presented their request for disqualification and made a partial record in support of the request.

After such an evaluation, the court has concluded that it cannot accept as reasonable the explanations given by Grosser–Samuels, Schultz, and Mansfield for the evidence adduced by JDE and duNouveau that shows that Shultz and his firm were serving as attorneys for JDE, albeit in a limited area, from December 2005 until late March 2006. While the court has uncertainty as to the reason why Schultz and his firm assumed the capacity as attor-

---

**4.** In *In re American Airlines, Inc.* the Fifth Circuit suggested that the "appearance of impropriety" standard no longer applies in the court's probe of ethical restraints. 972 F.2d 605, 617–19 (5th Cir.1992). However, only approximately two weeks earlier the Fifth Circuit noted in *In re Dresser Industries, Inc.* that it has applied particularly the admonition in canon 9 of the American Bar Association's Canons of Ethics that lawyers should avoid even the appearance of impropriety. 972 F.2d 540, 543 (5th Cir.1992). As recently as

2001 the Fifth Circuit gave effect to the ABA Code of Professional Responsibility (in which the "appearance of impropriety" standard is expressed) even though it had been replaced by the ABA Model Rules of Professional Conduct. *Horaist v. Doctor's Hosp. of Opelousas*, 255 F.3d 261, 266 (5th Cir.2001) (stating that ethical canons relevant to the disqualification issue before the court include the ABA Model Code of Professional Responsibility and the ABA Model Rules of Professional Conduct).

neys for JDE, the court is satisfied that they did so knowingly and voluntarily.

■ The record supports the contention of JDE and duNouveau that only two months before Schultz filed this intellectual-property action on behalf of Grosser–Samuels against JDE he and his firm were designated in writing by JDE, acting through Grosser–Samuels as president of JDE, as JDE's "attorney to transact all business in the United States Patent and Trademark Office connected [with a particular trademark application]," and, Schultz, in particular, was designated as JDE's "attorney with full power of substitution and revocation, to transact all business connected with" the trademark application. Mot. to Disqualify, App. at 30. On December 19, 2005, Schultz mailed that power of attorney document ("power of attorney"), along with others, to the Commissioner of Trademarks. Schultz was serving in the fiduciary capacity created by that document when he filed this suit against his client, JDE. Not until eight days after JDE first requested disqualification did Schultz take steps to disengage himself and his firm from their legal representation of, and fiduciary obligation to, JDE. That is when Schultz prepared a "Withdrawal of Attorney" document for submission to the Commissioner of Trademarks, withdrawing from representation of JDE as to the intellectual property matter mentioned in the power of attorney, giving as his reason for the withdrawal that "[r]epresentation is likely to result in conflict of interest." Resp. to Mot. to Disqualify, App. at 107.

In an attempt to explain away the power of attorney, Grosser–Samuels states in her declaration that, because she had signed so many similar documents, she was not aware at the time she signed the power of attorney that she was "granting a Power of Attorney to the law firm that represented [her] personally to act on behalf of

JDE." Resp. to Mot. to Disqualify, App. at 3. Mansfield's answer to the power of attorney is his declaration that he "did not give authorization for the Attorneys to file a Revocation and Power of Attorney for the mark 'THE MINI'S BY JACKIE G.'" *Id.* at 9, ¶ 14. Schultz's explanation of the power of attorney is that a paralegal in his office, while preparing documents pertaining to personal trademark and/or patent applications of Grosser–Samuels, "in good faith, but in error, prepared one extra Power of Attorney for the mark 'THE MINI'S BY JACKIE G', which was later learned to be owned by JDE." *Id.* at 22, ¶ 8.

The court finds those explanations incredible. The power of attorney could not more pointedly say that it pertains to an application filed by JDE, starting out with the language that "Jacquelin Design Enterprises, Inc. is the owner of the entire right, title and interest of the trademark Application listed below." Mot. to Disqualify, App. at 30. It then, again using JDE's name, very specifically says that JDE, "by and through its undersigned representative," appoints Schultz and his firm to act in the capacities stated in the power of attorney. *Id.* Nor could anyone have believed that the document dealt with the personal affairs of Grosser–Samuels when the signature block was as follows:

JACQUELIN DESIGNS ENTERPRISES, INC.

By: /s/ *Jacquelin*

Printed Name: Jacquelin Grosser Samuels

Title: President

*Id.* at 31.

Schultz, Grosser–Samuels, and Mansfield undoubtedly discussed the matter before the power of attorney was prepared and filed. As early as September 2005 Schultz was conferring with Mansfield, a

business consultant in the employ of JDE, concerning intellectual property issues. Mot. to Disqualify, App. at 18. In November 2005, Mansfield and Grosser–Samuels had a telephone meeting to discuss Schultz's law firm and the setting up of a meeting for additional work on filings. *Id.* at 21. Again in November 2005 Mansfield devoted time to preparing a check for Schultz and delivering it "along with scope of work for additional filing maintenance." *Id.* On December 7, 2005, Mansfield had lunch with Schultz and Grosser–Samuels concerning intellectual property matters. *Id.* at 25. The time devoted by Mansfield to all those activities was charged to, and paid for by, JDE. *Id.* at 20, 22, 26.

The fact that the participants knew what they were doing when they arranged for Schultz and his firm to be attorneys for JDE in reference to the trademark application finds support in the records of billings by Schultz's law firm to Grosser–Samuels. The law firm devoted significant time between December 1 and December 19, 2005, to reviewing trademark application information, drafting and reviewing power of attorney documents, and filing the documents. Resp. to Mot. to Disqualify, App. at 61–62. On December 1 an employee of Schultz's firm reviewed materials received from "client," did research to determine the status of trademarks, and drafted a memo and "status matrix." *Id.* at 61. On December 7 the same employee drafted several powers of attorney for various trademarks.[5] *Id.* On December 7 Schultz met "with Client re status of applications [and reviewed] United States Patent and Trademark Office database information." *Id.* On December 9 Schultz reviewed and revised a power of attorney; and, another attorney in the office re-

viewed trademark registrations and applications, checked the status of each application and registration with the United States Patent and Trademark Office database, reported to a partner concerning eight separate applications and registrations, and drafted, reviewed, and revised powers of attorney. *Id.* The drafting, reviewing, and revising of powers of attorney for various trademarks was resumed on December 13. *Id.* On December 19 one of the attorneys created a "summary spreadsheet of ownership of intellectual property." *Id.* A second December 19 entry notes the activities of two attorneys. *Id.* at 62. First, the activity was noted to be "[r]eview Power of Attorneys received from client and attention to filing with USPTO." *Id.* The other attorney was Schultz, who on December 19 reviewed various power-of-attorney documents, had a telephone conference with "Client," and devoted "[a]ttention to filing Power of Attorney documents with the United States Patent and Trademark Office." *Id.* at 62.

The court is unwilling to accept the contentions that, after all those reviews, studies, and revisions, a power of attorney naming Schultz and his firm as attorneys for JDE was prepared by accident, such a power of attorney was accidently signed by Grosser–Samuels, and Schultz, following his final review of the documents, accidently sent such a power of attorney to the Commissioner of Trademarks. The failure of Grosser–Samuels to present a credible explanation that would support disregard of the power of attorney leaves the court no choice but to accept the power of attorney, the transmittal letter to the Commissioner of Trademarks, and the "Withdrawal of Attorney" document at face value, *i.e.*,

---

**5.** The December 1 entry and the first part of the December 7 entry show "KLN" as the initials of the service provider. Presumably "KLN" is the "Kristy Needham," a paralegal, whom Schultz, in his declaration, credits with preparing in error the power of attorney appointing Schultz and his firm as attorneys for JDE.

that JDE appointed Schultz and his firm as its attorneys with respect to a trademark application, that Grosser–Samuels knew that JDE was making the appointment when she signed the power of attorney as president of JDE, that Schultz knew that he and his firm were being appointed as attorneys for JDE, that Schultz knew when he sent the document to the Commissioner of Trademarks that he was filing a document that designated him and his firm as attorneys for JDE with respect to the intellectual property matter mentioned in the document, and that Schultz and his firm continued to be designated as attorneys for JDE until late March 2006.

Under the Fifth Circuit case authority previously discussed, the motion to recuse had merit at the time it was filed. At that time Schultz was serving as an attorney for JDE at least in respect to an intellectual property matter pending before the Commissioner of Trademarks. Schultz recognized the problem when he prepared and submitted his "Withdrawal of Attorney" with the explanation that his representation of JDE was likely to result in a conflict of interest. Notably, he did not give as a reason that the designation of him and his firm as attorneys for JDE was a mistake or otherwise was unintended.

There being no showing of a social interest to be served by Schultz's representation of Grosser–Samuels and Burns in this action that would outweigh the public perception of his impropriety or that JDE consented to the representation, Schultz was disqualified from filing this action and from representing Grosser–Samuels and Burns in defense of the counterclaim. The court further concludes that the termination by Schultz in late March 2006 of his

and his firm's attorney-client relationship with JDE does not cause the then meritorious motion to disqualify to become less meritorious.

Even if the court were to view the matter from the standpoint of an attorney representing a party to litigation against a former client, the outcome would be the same. As noted above, the court is convinced that Schultz served as an attorney for JDE in respect to at least one intellectual property matter. The court assumes, for the sake of discussion at this point, that Schultz's representation of JDE discontinued sometime before this suit was filed in February 2006. Schultz's former intellectual property representation of JDE is substantially related to the intellectual property issues raised by the pleadings in this case. Thus, there is an irrebuttable presumption that relevant confidential information pertaining to the affairs of JDE was disclosed to Schultz while he was acting as attorney for JDE. The disclosures could have been by Grosser–Samuels, the then president of JDE, or by Mansfield, the business consultant for JDE. Therefore, under the assumed fact, Schultz would be disqualified from representing Grosser–Samuels against JDE in this action.

If the appearance-of-impropriety standard is applied to this case, the need for disqualification would become even more apparent.[6] In addition to the direct conflict discussed above, a reasonable inference the court draws from the record of this case is that in the latter part of 2005 Schultz not only was serving as an attorney for JDE, at least as to an intellectual property matter, he at the same time was cooperating with Grosser–Samuels in fur-

---

6. In *In re American Airlines, Inc.*, the Fifth Circuit used language that would suggest that even if the appearance-of-impropriety standard no longer applies, it indirectly lives on as an ingredient of the ethical prohibition against appearing on behalf of a former client's adversary under certain circumstances. 972 F.2d 605, 611 (5th Cir.1992).

therance of a secret plan she had, while serving as president of JDE, to take from JDE and convert for her personal interest intellectual property assets, as well as customers, of JDE.[7] The court has noted from items in the record that activity was devoted by Schultz and his firm to causing JDE's trademarks to be treated as the property of Grosser–Samuels personally. Defendant's Exhibit 10 to the March 21 hearing was identified as depicting trademarks of JDE. Tr. of Mar. 21, 2006, hr'g at 45. The trademarks claimed by JDE include "Jacquelin," "True," and "Magic by Jacquelin." Those trademarks were the subjects of activity by Schultz and his firm on behalf of Grosser–Samuels in December 2005 and January 2006. Mot. to Disqualify, App. at 29; Resp. to Mot. to Disqualify, App. at 52, 54, & 55.

The fact that Schultz, Grosser–Samuels, and Mansfield would be working together to advance the personal interests of Grosser–Samuels while she was serving as president of JDE defies ethical explanation. According to Mansfield's declaration, in September 2005 he was hired, presumably by Grosser–Samuels (with whom he had been acquainted since they were in high school), as a consultant for JDE.

Resp. to Mot. to Disqualify, App. at 6–7, ¶¶ 2 & 3. In that capacity, he was "to review a number of different business issues that JDE was facing at the time, including cash flow difficulties, operating efficiency and control and general business matters such as leases and contracts." Id. at 7, ¶ 3. The intensity of his activity, purportedly on behalf of JDE, and the cost to JDE of his activity, is partially disclosed by Mansfield's billings that accompanied the motion to disqualify. Mot. to Disqualify, App. at 16, 18, 21, 24–25. The billings disclose that Mansfield was playing a role in running JDE in cooperation with Grosser–Samuels as its president. At the same time, the two of them, in cooperation with Schultz, were engaged in significant activity to further the personal interests of Grosser–Samuels to the detriment of JDE.[8] In other words, each of them appears to have been acting in violation of fiduciary obligations owed to JDE. One of the subjects of all of that activity is the very patent upon which Grosser–Samuels bases her claim against JDE in this action.

Similar ethical concerns relate to the transactions of Grosser–Samuels, Mansfield, and Schultz in reference to an entity they refer to as "Pacific Crown Holdings"

---

7. Grosser–Samuels' collaboration with Schultz was not the first time Grosser–Samuels, while serving as president of JDE, secretly collaborated with someone to the potential detriment of JDE. Defendant's Exhibit 11 to the March 21, 2006, hearing exposes a plan by Grosser–Samuels in 2001, which was aborted for some reason, to secretly appropriate JDE's business for her personal benefit and for the benefit of the person collaborating with her. Grosser–Samuels tells her then collaborator that "[m]y objective is to get our new venture up and rolling while I am on [JDE's] payroll transitioning their company," that "I need the $ until I get my house sold and our company up and running," and that "I think the mission should begin taking place behind the scenes as long as possible 1) because I am being paid...." Def.'s Ex. 11, first page, ¶¶ 1 & 3.

8. Considering Mansfield's obligations to JDE, one would certainly puzzle over the activities he engaged in on behalf of Grosser–Samuels personally, as reflected by his declaration. Resp. to Mot. to Disqualify, App. at 7–11. Not only was Mansfield, while employed as a consultant by JDE, providing services to its president to the detriment of JDE, he was charging JDE for the time he devoted to those services. In addition to the examples mentioned above in the text, there is an entry dated December 9, 2005, worded as follows:

Review comms from Russ Schultz and begin review of budget for next ninety days on trademark issues for JDE. Relegate issues of JGS personal ownership of trademarks to JGS for her discussion with Russ.

Mot. to Disqualify, App. at 25.

or "PCH." Information developed at the March 21 hearing causes the court to think that the allegations made in the counterclaim relative to PCH basically are correct. *Supra* at 8–10, ¶¶ 4, 5, & 7.[9] When the ethical concerns related to Schultz's apparent collaboration with Grosser–Samuels in the breach of her fiduciary obligations to JDE are combined with the conflict-of-interest issues arising from the designation by Schultz and his firm as attorneys for JDE, a serious appearance of impropriety problem exists. Public suspicion almost certainly would arise from the representation by Schultz or any attorney associated with his firm of Grosser–Samuels and Burns in this action. That suspicion outweighs any social interest that continued representation conceivably could serve. There is no suggestion that other lawyers could not represent Grosser–Samuels and Burns as ably as Schultz or any attorney associated with his firm.

For the reasons given above, the court is ordering that Schultz and the attorneys associated with his firm are disqualified from serving as an attorney for Grosser–Samuels and Burns in this action.

## V.

### *The Ground of the Motion Based on the Prospect that Schultz Might be a Witness in, if not a Party to, the Litigation*

Because of the conclusions the court has reached that Schultz has a conflict disqualification, the court is not devoting significant attention in this memorandum opinion to the ground of the motion urging disqualification based on the prospect that he could be called as a witness in this action

and might well be made a party. The court notes, however, that this ground raises serious concerns. Schultz probably did assist Grosser–Samuels in engaging in the conduct of which JDE and duNouveau complain by their counterclaim. Undoubtedly he would argue that he legitimately did so as Grosser–Samuels' personal attorney. But, the record suggests that the more persuasive arguments would be that he violated a fiduciary duty to JDE when he did so, and that he joined with Grosser–Samuels and Mansfield in their violations of their fiduciary duties to JDE. That being so, he probably would be a witness, if not made a party.

## VI.

### *Request that Schultz's Law Firm be Disqualified*

The court is not ordering disqualification of Schultz's law firm as such, because the court does not consider that the law firm represents Grosser–Samuels or Burns in this action, only Schultz individually. However, the court is interpreting the motion to disqualify as including a request that all attorneys associated with Schultz's firm, individually, be disqualified from providing representation to Grosser–Samuels or Burns. The court has concluded that such a disqualification would be appropriate. Rule 1.09(b) of the Texas Disciplinary Rules of Professional Conduct provides, with an exception not applicable here, that "when lawyers are or have become members of or associated with a firm, none of them shall knowingly represent a client if any one of them practicing alone would be

---

**9.** Evidence received at the March 21 hearing indicates that JDE and duNouveau might be in error in alleging that Pacific Crown Holdings is a corporation. The document that purportedly gave PCH rights in the patent for the adjustable clasp recites that it is a grant by Grosser–Samuels to "Edwin Lail dba Pa-

cific Crown Holdings (PCH)." Pl.'s Ex. 13, first page. Thus, that document would suggest that the transfer by Grosser–Samuels of rights to license the adjustable clasp were to her father, personally, doing business as Pacific Crown Holdings, and not to a corporation.

prohibited from doing so" because of a conflict disqualification. Tex. Disciplinary R. Prof. Conduct 1.09, Tex. Gov't Code Ann., tit. 2, subtit. G, app. A (Vernon 2005). The justification for such a rule was noted by the Fifth Circuit in *American Airlines*, when it said that "[a] second irrebuttable presumption is that confidences obtained by an individual lawyer will be shared with the other members of his firm." 972 F.2d at 614 n. 1.

Therefore, the court is ordering that all attorneys associated with Schultz's law firm likewise are disqualified.

## VII.

### *The Request for Sanctions*

The court has decided to hold in abeyance the request of JDE and duNouveau for sanctions against Schultz and his firm. While a decision on the request would be appropriate at this time under the record already made, the court when making a decision would prefer to take into account any further developments there are on the representation issue. Before making a decision, the court probably will hear from the parties relative to the possibility of disciplinary action against Schultz under the authority of rules LR 83.8(b)(1) and (3) of the local civil rules of this court.

## VIII.

### *Order*

For the reasons stated above,

The court ORDERS and DECLARES that Schultz and each attorney associated (either as a partner, an associate, as of counsel, as a shareholder, or otherwise) with the law firm with which Schultz is associated are disqualified from providing representation to Grosser–Samuels or Burns in, or in connection with, the above-captioned action.

The court further ORDERS that by 2:00 p.m. on September 20, 2006, Grosser–Sam-

uels and Burns each file a document informing the court of the identity of the attorney who will be representing her or him in this action, including the attorney's contact information; or, if Grosser–Samuels or Burns plans to proceed *pro se* in this action, she or he file a document by such time and date advising the court of that fact and providing the court contact information pertaining to her or him.

The court further ORDERS that the stay as to discovery ordered by the order signed in this action on March 30, 2006, and the more general stay ordered by the order signed March 31, 2006, be, and are hereby, lifted.